**[WEST COAST LIFE INS. CO. et al. v. MERCED IRR. DIST.**

No. 9242.

Circuit Court of Appeals, Ninth Circuit.

Sept. 5, 1940.

Rehearing Denied Oct. 15, 1940.

Chas. L. Childers, of El Centro, Cal., for appellant West Coast Life Ins. Co.

Hugh K. McKevitt, of San Francisco, Cal., for appellant Pacific Nat. Bank of S. F.

Clark, Nichols & Eltse and George Clark, all of Berkeley, Cal., for appellant Mary E. Morris.

Chase, Barnes & Chase and Lucius F. Chase, all of Los Angeles, Cal., for appellants R. D. and Belle Crowell.

Peter tum Suden, of San Francisco, Cal., for appellants Rigby and tum Suden, etc.

David Freidenrich, of San Francisco, Cal., for appellant Claire Strauss.

Herman Phleger and Brobeck, Phleger & Harrison, all of San Francisco, and Evan Haynes, of Berkeley, Cal., for appellants Moore et al.

W. Coburn Cook, of Turlock, Cal., for appellants Bekins et al.

Hugh K. Landram and C. Ray Robinson, both of Merced, Cal., and Downey, Brand & Seymour and Stephen W. Downey, all of Sacramento, Cal., for appellee Merced Irr. Dist.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Appellee Merced Irrigation District, an irrigation district organized under the provisions of the California Irrigation District Act, Cal.Stats. 1897, p. 254, as amended, Deering's General Laws, Act 3854, filed a petition for composition of debts under the provisions of Chapter IX of the Bankruptcy Act of 1898 as amended, 11 U.S.C.A. §§ 401–404. After a hearing of the petition, the District Court entered its interlocutory decree confirming the plan of composition proposed by the District. This is an appeal by certain bondholders of the District from said decree of confirmation.

The District is one of the largest irrigation districts in California, and was organized in 1919. To complete the development of the District three separate series of bonds, aggregating $16,190,000 in principal amount, were issued and sold. The first issue was in the principal amount of $11,940,000, dated January 1, 1922, due serially from 1934 to 1962, and bearing interest part at 5½% and part at 6%. The second issue was in the principal amount of $3,250,000, dated May 1, 1924, due serially from 1937 to 1964, and bearing interest at 6%. The third issue was in the principal amount of $1,000,000, dated April 1, 1926, due serially from 1965 to 1966, and bearing interest at 6%. The bonds were each in the amount of $1,000.

The District made all payments according to the maturities of its bond issues, including principal and interest, up to and including the payment due January 1, 1933. It defaulted on the July 1, 1933, payment.

Prior to such default and in March, 1932, a committee of representatives of the bond underwriters and an association called the California Irrigation and Reclamation District Bondholders Association, merged and thereafter those so merging functioned as a Bondholders' Committee. This Committee solicited the deposit of District Bonds under a deposit agreement dated March 1, 1932, and a major portion of the bonds, including those of some of appellants herein, were deposited with the Committee. After

negotiations a refunding program was submitted by the Board of Directors to the electors of the District, and was voted upon favorably in November, 1933. This program provided for payment in full of the bond principal of the District with an extension of maturities and some reduction in interest.

After the enactment of Section 36 of the Emergency Farm Mortgage Act, 43 U.S.C.A. § 403, an application was made on December 16, 1933 by the District to the Reconstruction Finance Corporation [hereinafter for convenience referred to as R. F. C.], for funds with which to reduce and refinance the debt of the District.

The R. F. C. on November 14, 1934 adopted a resolution authorizing a loan to the District of not exceeding $8,600,000 plus 4% interest upon the amount to be paid thereunder. It was provided in the resolution that the loan should be made subject to certain specified terms and conditions, one of which was set forth as follows in the resolution: "5. * * *(c) All or any part of the Old Securities acquired or held by or on behalf of this Corporation (R.F.C.) through any disbursement of or from the loan authorized hereunder as well as all rights in or to such Old Securities, may be kept alive for a greater or lesser time and for any purpose the Division Chief and Counsel may deem necessary, but this Corporation may at any time require the Borrower [District] to issue its new 4% bonds and exchange the same for the Old Securities held by or on behalf of this Corporation. Until such Old Securities have been exchanged for New Bonds, all such securities as well as all rights in or to the same shall continue to be and constitute obligations of the Borrower for the full amount thereof and nothing in this resolution shall be deemed to limit the right of this Corporation to enforce or cause to be enforced full payment of principal and interest of such Old Securities as and when the Division Chief and Counsel shall deem it advisable to do so * * *."

On December 11, 1934, the District by resolution accepted the loan and agreed to the terms and conditions of the resolution of R. F. C. above referred to.

The loan from R. F. C. was calculated to pay 51.501 cents on the dollar of bond principal, with nothing for accrued interest. The proposal was submitted to the California Districts Securities Commission, and the Commission by its Order No. 54 on

February 15, 1935, approved the issuance of the refunding bonds and the making of the contract therefor. Thereafter the proposal was submitted to the electors of the District, and they voted in favor thereof on March 20, 1935.

At this time the Bondholders' Committee submitted to the bondholders whom it represented a questionnaire to determine whether they desired to take advantage of the cash settlement proposition. The majority of the bondholders (63% of the total) indicated their preference for the cash offer plan. The Committee thereupon voted in favor of the plan, and notified all depositing bondholders that they could withdraw their bonds within thirty days upon payment of their proportion of the expenses of the Committee, otherwise the Committee would deposit all bonds in its hands under the plan. Certain of the bondholders, opposing the plan, withdrew their bonds from the Committee.

By April 18, 1935, 75% of the District Bonds had been deposited under the cash plan, and the District filed a proceeding under Section 80 of the Bankruptcy Act as then in effect, 11 U.S.C.A. § 303, for confirmation. We shall refer to this as the first bankruptcy case.

Arrangements were made to carry out the plan, and on October 4, 1935, over 86% of the outstanding bonds were deposited and surrendered and the owners thereof received their $515.01 per bond.

On March 4, 1936, the District Court rendered its decree in the first bankruptcy case confirming the plan. An appeal was taken to this court from said decree, in view of the decision of the United States Supreme Court rendered on April 29, 1936, in the case of Ashton v. Cameron County Water Improvement District No. One, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309, holding Section 80 of the Bankruptcy Act unconstitutional. We entered our memorandum decision on April 12, 1937 [Bekins v. Merced Irr. Dist., 9 Cir., 89 F.2d 1002, certiorari denied 302 U.S. 709, 58 S.Ct. 30, 82 L.Ed. 548], reversing the decree of the District Court and remanding the cause with directions to dismiss.

During the pendency of said proceedings in the Supreme Court, the District, on July 20, 1937, filed a petition in the Superior Court of the State of California in and for Merced County under the provisions of California Statutes 1937, Chapter 24, for confirmation of the same plan of composi-

tion. In this case the R. F. C. filed its "consent" dated July 9, 1937. The case went to trial and was contested by substantially the same objectors as appellants in the principal case. The cause was submitted and the trial judge rendered an opinion on October 5, 1937, in favor of the District and ordered the preparation of findings and a decree in accordance with his opinion. No findings, however, were ever presented by the District and none was ever filed and no judgment has ever been signed and filed therein.

The present proceedings were inaugurated by the filing of a petition in the District Court on June 17, 1938, pursuant to Chapter IX of the Bankruptcy Act of 1938, 11 U.S.C.A. §§ 401-404.

Appellants raise the plea of res judicata by virtue of the decision of this court reversing the decree in the first bankruptcy case above referred to, as their "Ninth Proposition". They also raise, as their "Eighth Proposition" the pendency of the proceedings before the Superior Court for Merced County in bar of these proceedings. Other points raised by appellants may best be stated by quoting from their opening brief:

"First Proposition: The Reconstruction Finance Corporation is not a creditor affected by the plan of composition and its consent is not entitled to be considered."

"Second Proposition: Petitioner is barred from obtaining confirmation of its proposed plan of composition by reason of its lack of good faith and constructive fraud."

"Third Proposition: Petitioner herein is not 'insolvent or unable to meet its debts as they mature' ".

"Fourth Proposition: The plan of composition is not fair, equitable or for the best interests of the creditors, and it is discriminatory."

"Fifth Proposition: The claims were improperly classified as being all of the same class."

"Sixth Proposition: The decree unlawfully takes trust funds and vested rights belonging to the appellants."

"Seventh Proposition: By the terms of the statute the court was without jurisdiction."

"Tenth Proposition: Chapter IX of the Bankruptcy Act is void as applied to appellants."

We shall deal with each point raised by appellants separately, enlarging on the statement of facts under each point where necessary for an understanding of the issue raised. We do not treat of the points in the same order as treated by appellants, however, since we deem it more orderly to discuss jurisdictional matters first.

### Res Judicata

Appellants' contention here is that "the rule of res judicata applies to questions of law as well as to questions of fact"; that the decision of this Court in the first bankruptcy case reversed the judgment of the United States District Court "on the ground that the grant of judicial power under which the latter Court had acted in entering a decree which impaired the obligations of the bonds held by the appellants was outside the bankruptcy clause of the Constitution and on that ground void"; that "the grant of Federal judicial power under which the District Court acted in rendering its prior decree was the same as the grant of Federal judicial power under which the District Court acted in rendering the decree now appealed from"; that "when a person obtains a judgment that a statutory grant of power—whether administrative or judicial—is void, he may not be endlessly required to re-try the issue by repeating the grant in new statutes".

For a clear understanding of appellants' point, we shall briefly review the respective sections of the statute under which the first bankruptcy case was brought [48 Stat. 798, 11 U.S.C.A. §§ 301–303] and the statute under which the present case was brought [11 U.S.C.A. §§ 401–404], as well as the United States Supreme Court decisions as to their constitutionality.

In Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 896, 80 L.Ed. 1309, the Supreme Court had under consideration the question of the constitutionality of the first Act as applied to a Texas water improvement district. The Court examined the corporate structure of the improvement district, and decided that it was a political subdivision of the State of Texas. It held that the statute under consideration was invalid because an "application of the statutory provisions [in the old Act] might materially restrict [the district's] control over its fiscal affairs".

It also decided that the State of Texas could not consent to the proceedings under

the statute, for to do so would constitute an impairment of the obligation of contract, prohibited by the Federal Constitution.

It was after the decision in the Ashton case, supra, that this court rendered its decision in the first bankruptcy case relied upon by the appellants in their plea of res judicata, reversing a decree of the District Court which had approved a plan of composition.

In August, 1937, after the Ashton decision, the present Municipal Bankruptcy Act, 11 U.S.C.A. §§ 401–404 was passed. The question of the constitutionality of this second Act was before the United States Supreme Court in United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137. The Court considered the new Act in relation to the decision in the Ashton case, supra, and said (page 49 of 304 U.S., page 815 of 58 S.Ct., 82 L.Ed. 1137):

"In Ashton v. Cameron County District, supra, the court considered that the provisions of chapter 9 [§§ 78–80, 11 U.S.C.A. §§ 301–303,] authorizing the bankruptcy court to entertain proceedings for the 'readjustment of the debts' of 'political subdivisions' of a State 'might materially restrict (its) control over its fiscal affairs,' and was therefore invalid; that if obligations of States or their political subdivisions might be subjected to the interference contemplated by chapter 9, they would no longer be 'free to manage their own affairs.'

"*In enacting chapter 10* [§§ *81–84, 11 U.S.C.A.* §§ *401–404*] *the Congress was especially solicitous to afford no ground for this objection.* In the report of the Committee on the Judiciary of the House of Representatives, which was adopted by the Senate Committee on the Judiciary, in dealing with the bill proposing to enact chapter 10, the subject was carefully considered. The Committee said:

"'* * * The Committee on the Judiciary is not unmindful of the sweeping character of the holding of the Supreme Court above referred to (in the Ashton Case), and believes that H. R. 5969 *is not invalid or contrary to the reasoning of the majority opinion.* * * *

"'The bill here recommended for passage expressly avoids any restriction on the powers of the States or their arms of government in the exercise of their sovereign rights and duties. * * *'

"We are of the opinion that the Committee's points are well taken and that chapter 10 is a valid enactment. *The statute is carefully drawn so as not to impinge upon the sovereignty of the State.* * **" [Emphasis supplied.]

The present proceedings are brought under the second Act, declared constitutional by the Bekins case, supra.

It is asserted by appellants that the plea of res judicata should be sustained even though we might find differences in the two Acts. We quote from their brief on the question: "But the truth is that notwithstanding any changes in words or lettering of sentences, the trial eventuates in that which offends the sovereignty of the state in the same manner that the decree of Section 80 offended, as determined in the Ashton case. It was not the form of trial, the form of the petition, the form of the consents or the name of the decree that counted. It was that an effectuating federal decree was not permissible under our plan of separate sovereignties."

This argument, of course, assumes that our decision in the first bankruptcy case reversing the decree of the District Court decided the question of law as between the parties to this proceeding that Congress was without power to enact *any* bankruptcy legislation relating to a California irrigation district. That question was not before us, and could not have been decided. The sole questions with which we were concerned were—Did the District Court at that time have jurisdiction to entertain the proceedings? Was the statute which purported to confer jurisdiction on the District Court constitutional? Our answer to those questions was in the negative—that at the time of such proceedings there was no valid law in effect conferring jurisdiction on the District Court.

Subsequent to our decision a law has been enacted which has been declared valid by the Supreme Court, and that law gives the District Court jurisdiction to entertain the proceedings now before us. This holding cannot be tortured into a decree that forever bars the petitioner from enjoying with all others this completely changed situation.

It is argued, however, that the new Act cannot be distinguished from the old. Appellants state "When a person obtains a judgment that a statutory grant of power—whether administrative or judicial—

is void, he may not be endlessly required to re-try the issue by repeating the grant in new statutes". Sound as this statement undoubtedly is, as an abstract principle, it can have no application here where the Supreme Court has decided that the two Acts are effectively distinguishable. The Bekins case definitely holds that the constitutional objections found in the old Act are not to be found in the new Act.

It is next asserted by appellants that even assuming that the two Acts are distinguishable as to the grant of judicial power, that is, that the Bekins case did not overrule the Ashton case in that respect, still the decision of this Court in the first bankruptcy case is res judicata of the question of the power of a State to give its consent to bankruptcy proceedings.

■ There are two answers to this. First, an examination of our decision relied upon by appellants [89 F.2d 1002] does not disclose that we did other than to order that "a decree be filed and entered reversing the decree of said District Court, and remanding the cause with directions to dismiss the cause". No reasons were given for our decision. There is nothing to indicate whether we relied upon the argument made at the hearing that the legislation was beyond the power of Congress, or upon the argument that consent of the State would constitute an impairment of the obligation of contract. In fact, it does not even appear that we based our decision on either of these arguments. There may have been many reasons why the proceedings in the District Court should have been dismissed. At least these two reasons were argued by the appellants in that action. It cannot be said that the decision is res judicata as to either rule of law relied upon by appellants. Where a number of grounds for dismissal of an action are urged, an order of a court simply that the cause be dismissed, without an indication as to the ground upon which the court acted, can not be res judicata of all possible grounds for such order.

■ The second answer to appellants' theory is that even assuming that this court did decide that California could not properly consent to the proceedings brought under the old Act, this is not a holding that California can never consent to any bankruptcy legislation. All that was before us for decision was whether or not California could consent to the proceedings then before us. Assuming that we did decide the question of constitutionality upon this ground, still that decision would not be res judicata of the right of the State to consent to subsequent proceedings brought under a new and distinguishable Act.

In Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465, the United States Supreme Court had under consideration a plea of res · judicata in a case which may be said to be somewhat analogous to the one here under consideration.

The cited case involved the question of the liability of a beneficiary of a testamentary trust for taxes upon income which he had assigned to others prior to the tax years. The question first arose with respect to the tax year 1923. The Circuit Court of Appeals for the Seventh Circuit, 83 F.2d 655, held that under the Illinois law the trust was a spendthrift trust and the assignments were invalid. Upon that basis the Court held that the income was taxable to the beneficiary. Thereupon the trustees brought suit in the Illinois state court to obtain a construction of the will in respect to the power of the beneficiary to make the assignment. In this suit it was decided that the trust was not a spendthrift trust and that the assignments were valid. In a subsequent action for taxes for the years 1924, 1925, 1926 and 1929, the Government contended that the decision of the Circuit Court of Appeals to the effect that the income from the trust was taxable to the beneficiary was res judicata. The Supreme Court ruled against the Government's contention, stating [pages 8, 9 of 300 U.S., page 331 of 57 S.Ct. 81 L.Ed. 465]:

"The Government contends that the judgment relating to the income for 1923 is conclusive in this proceeding as res judicata. Tait v. Western Maryland Ry. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405. * * *

"We think that the ruling in the Tait Case is not applicable. · That ruling and the reasoning which underlies it apply where in the subsequent proceeding, although relating to a different · tax year, the questions presented upon the facts and the law are essentially the same. * * * *Here, after the decision in the first proceeding, the opinion and decree of the state court created a new situation.* The

determination of petitioner's liability for the year 1923 had been rested entirely upon the local law. * * * *The supervening decision of the state court interpreting that law in direct relation to this trust cannot justly be ignored* in the present proceeding so far as it is found that the local law is determinative of any material point in controversy." [Emphasis supplied.]

Now, let us compare the Blair case, supra, with the present case. In the Blair case, the decision relied upon in the plea of res judicata determined that under local law the assignments in question were invalid, and hence that the income from the trust was taxable to the beneficiary. After that decision, the State courts determined that the assignments were valid, contrary to the decision of the Circuit Court of Appeals. Thereafter, in a suit on taxes for subsequent years, by reason of the new situation created by the state court decision, the Supreme Court held that the decision in the first case was not res judicata.

In the present case the first decision determined that the District Court was without jurisdiction over proceedings brought under the unconstitutional Act. After our decision, the new statute was enacted, which has been declared constitutional by the United States Supreme Court. It follows, by the clearest reason, that if a decision of a state court declaring valid certain assignments which had been considered invalid by the Circuit Court of Appeals in arriving at its decision in the Blair case, supra, creates a "new situation" sufficient to justify the denial of the plea of res judicata, on like principles the enactment of a new and different statute and a decision by the highest Court of our Country declaring the same to be constitutional, will create a "new situation" sufficient to justify the denial of the plea in this case.

### Jurisdiction of the Court under the Statute

Appellants argue that: "Seventh Proposition: By the terms of the statute the court was without jurisdiction". Since this question attacks the jurisdiction of the court under the terms of the applicable statute, it would seem, in some respects, more orderly to treat of it before we proceed to the treatment of res judicata. We have reversed the treatment of the two points because it is necessary in res judicata to treat of the Ashton and Bekins cases in considerable detail, and with this treatment in mind our treatment of the other point may be more readily understood.

The argument of appellants under this point runs somewhat as follows: If the Bekins case did not overrule the Ashton case on the question of Federal power, then it follows that the Supreme Court in the Bekins case must have decided that the District involved was not a governmental agency. This argument is premised upon the holding of the Ashton case that since the agency there involved was a state agency, the statute there in question usurped the governmental powers of the State. The Court in the Bekins case held that the second Act did not usurp the sovereign powers of the State. Appellants then carry their argument—since the District involved in the Bekins case was determined not to be a state agency, then the Ashton case is still the law. The District involved in the principal case is a state agency under California decisions, therefore the Court has no jurisdiction.

But appellants' conclusion is wrong. The Court in the Bekins case did not premise its decision on the fact that the District involved was not a state agency, but rather that the Act as drawn did not usurp state powers. Let us quote again from the Bekins decision, 304 U.S. page 51, 58 S.Ct. page 815, 82 L.Ed. 1137, wherein the Court quotes the Committee on the Judiciary: " 'The bill here recommended for passage expressly avoids any restriction on the powers of the States or their arms of government in the exercise of their sovereign rights and duties. No interference with the fiscal or governmental affairs of a political subdivision is permitted. The taxing agency itself is the only instrumentality which can seek the benefits of the proposed legislation. * * *' " The Court then states: "We are of the opinion that the Committee's points are well taken and that chapter 10 [§§ 81–84] is a valid enactment. The statute is carefully drawn so as not to impinge upon the sovereignty of the State. * *" The remainder of the reasoning of the Court is upon the basis that while state agencies may be immune from taxation by the federal government, still consent of the state may remove that obstacle; that it follows, therefore, that a state may con--

sent to bankruptcy power over its agencies being conferred upon the federal courts.

Let us quote further from the Court's opinion (p. 54 of 304 U.S., page 816 of 58 S.Ct., 82 L.Ed. 1137): "The bankruptcy power is competent to give relief to debtors in such a plight and, if there is any obstacle to its exercise in the case of the districts organized under state law it lies in the right of the State to oppose federal interference. The State steps in to remove that obstacle. The State acts in aid, and not in derogation, of its sovereign powers. It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue."

Further, the Supreme Court may have found procedural differences in the two Acts to justify the conclusion that the later Act did not impinge the sovereign rights of the State. Assuming that it did so, we do not deem it within our province to reexamine the procedural aspects of the two Acts to say that the Supreme Court was wrong in its determination that there was a distinction.

The premise upon which the Appellants base their entire argument having fallen, there is nothing left to their point. The Bekins case held without question that the Act is constitutional as applied to a California Irrigation District, organized under the same California Statute as the one here involved. That case is binding upon us.

### State Proceedings as a Bar

Appellants assert: "Eighth Proposition: There is another action pending in the state courts of California upon the identical cause of action and demanding the same relief, and that that action was commenced and pending under state law prior to the passing of Chapter X [§§ 81–84] of the Bankruptcy Act upon which this proceeding was prosecuted."

In the appellants' brief there is a concise analysis of the California Composition Act as codified in Cal.Stat.1937, Chap. 24, p. 92, titled "Irrigation District Refinancing Act." We quote from the brief: "* * * that act provides that any irrigation district being unable to pay its debts as they mature, such debts may be liquidated, refinanced, or readjusted as therein provided. Such a proceeding is initiated by the Board of Directors of the district who shall adopt a plan. The plan must be concurred in by two-thirds in principal amount of the holders of each class of security affected thereby. The plan shall be presented to the California Districts Securities Commission and if found to be fair and equitable to the creditors the Commission shall approve the same and the board of directors is then authorized to file in the Superior Court in the county in which the district or the major part. thereof is located, a verified petition stating that the district is unable to meet such obligations as they mature; that it desires to effect the plan adopted and that it has been accepted by a sufficient number of creditors and the district desires to avail itself of the act. The Act provides that after the petition is filed the plan shall temporarily be in effect and that the filing of the petition shall automatically enjoin and stay, pending final determination of the proceedings as therein set forth, the commencement or continuance of proceedings or suits against the district or any officer thereof and shall enjoin and stay the enforcement of any lien or the levy of assessments except as is consistent with and in furtherance of the plan and that the Court in which the petition is filed shall have *exclusive jurisdiction* * * * with respect to all suits, actions and proceedings against the district on account of the indebtedness affected."

It is then provided for notice of hearing and service upon known holders of bonds affected and at any time prior to the hearing any creditor may answer; changes or modifications may be made and then the court if it finds the plan to be fair and equitable and that it complies with the provisions of the act and has been accepted in writing by the required number of creditors and the offer and acceptance are in good faith and that the district is authorized to take the necessary action to carry out the plan, shall make an interlocutory judgment approving the plan. This decree does not enforce the plan as against non-consenting creditors. A separate hearing follows in which the rights of non-consenting creditors are determined through the condemnation of the bonds held by the objecting bondholders, etc. under eminent domain.

The California Act was passed to become effective in March, 1937. The Federal Bankruptcy Act was amended to in-

clude the provision under which the present proceedings were brought in August, 1937. However, at the time of the amendment referred to, the state court proceedings under the California Act, which are set up in bar to the proceedings before us, were pending. The case was pending in the state court at the time the bankruptcy amendment had been held constitutional in the Bekins case (April 7, 1938). On March 10, 1938, the Superior Court in which the state composition proceedings were pending, reached a point of decision in the case, and the court was waiting the filing of proposed findings of fact and conclusions of law by the District, in accordance with the California Code of Civil Procedure [C.C.P. § 632]. The findings of fact and conclusions of law have never been submitted to the court for approval, and no findings of fact or conclusions of law and no judgment has been filed or entered in the state proceedings. The question then is whether such pendency of an action in the state court on substantially the same matter, is a bar to the federal action. If the state statute and action thereunder are superseded by the federal action, then, of course, there is no bar to the court's proceeding with the federal action.

In Re Watts and Sachs, 190 U.S. 1, 23 S.Ct. 718, 724, 47 L.Ed. 933, there was a state proceeding under Section 1245 of the Revised Statutes of Indiana, Thornton's Rev.Stat. of 1897, providing that a receiver might be appointed, "When a corporation has been dissolved, or is insolvent, or is in imminent danger of insolvency, or has forfeited its corporate rights." The Court appointed a receiver to complete old contracts but enter into no new ones. Certain creditors petitioned under the Bankruptcy Act of the United States for proper proceedings in the Federal Court and a receiver was appointed by the judge of that court and was given directions to take possession of the properties involved. He did so. Upon appeal, the court said at page 27 of 190 U.S., at page 724 of 23 S.Ct., 47 L.Ed. 933: "* * * And the operation of the bankruptcy laws of the United States cannot be defeated by insolvent commercial corporations applying to be wound up under state statutes. The bankruptcy law is paramount, and the jurisdiction of the Federal courts in bankruptcy, when properly invoked, in the administration of the af-

fairs of insolvent persons and corporations, is essentially exclusive. Necessarily, when like proceedings in the state courts are determined by the commencement of proceedings in bankruptcy, care has to be taken to avoid collision in respect of property in possession of the state courts. Such cases are not cases of adverse possession, or of possession in enforcement of pre-existing liens, or in aid of the bankruptcy proceedings. The general rule as between courts of concurrent jurisdiction is that property already in possession of the receiver of one court cannot rightfully be taken from him without the court's consent, by the receiver of another court appointed in a subsequent suit; but that rule can have only a qualified application where winding-up proceedings are superseded by those in bankruptcy as to which the jurisdiction is not concurrent."

See also Taylor v. Sternberg, Trustee in Bankruptcy, 293 U.S. 470, 55 S.Ct. 260, 79 L.Ed. 599.

It is argued by appellants that the action having been commenced in the state court is not superseded by the Bankruptcy Act, providing composition as is sought in this case. They cite certain authorities as sustaining their contention, among them the following: "Proceedings under State insolvency laws pending at the time of the passage of a bankrupt act are not affected by the latter act." Note in 45 L. R.A. at page 187.

However, the L.R.A. note cited by appellants referred to the original Bankruptcy Act, which contained a provision expressly saving certain state proceedings. This saving clause has since been stricken out, and the law as it now stands is in conformity with the view expressed by the opinion of In re Watts, supra. See 8 C.J.S. Bankruptcy, § 12, p. 421, wherein it is stated: "The provisions of the federal Bankruptcy Act are superior to all state laws upon the subject, and suspend them in so far as they conflict therewith and relate to the same subject matter and affect the same persons. [Citing many cases.]"

In Pitcher v. Standish, 90 Conn. 601, 98 A. 93, L.R.A.1917A, 105, it was held that State laws are in conflict with federal, so as to be suspended by the latter when the two cover the same field or the subject matter of the state law is with-

in the purview of the federal legislation. And in the case of Leonard Levin Co. v. Star Jewelry Co., 54 R.I. 465, 175 A. 651, it was held that insolvency law of a state is superseded by Bankruptcy Act, at least in so far as the law relates to the distribution of assets for payment of certain debts. The clarity of these cases and the extent of the uncontradicted authority compel the ruling that the state act was superseded by the federal Bankruptcy Act.

## Validity of the Act as Applied to Appellants

Appellants' point here, under their "Tenth Proposition", is divided into two subheadings, the first of which is entitled "As here applied the Bankruptcy Act prefers junior liens to senior liens, and discriminates among liens of equal rank". This particular phase of appellants' argument we shall deal with under our discussion of the merits of the controversy.

The second portion of this "Tenth Proposition" is subtitled "The California statute purporting to consent to this proceeding is void under the Constitution of California".

The California legislature enacted a statute authorizing its agencies to proceed under the federal Bankruptcy Act (California Statutes, 1939, Chapter 72, p. 1009). The argument of appellants, however, is that such statute is invalid in that it is repugnant to Section 16 of Article I of the Constitution of California which provides in part, " * * * No * * * law impairing the obligation of contracts shall ever be passed."

We do not deem it necessary to discuss this point in detail, as the United States Supreme Court disposed of a similar contention in the Bekins case. There the argument was made that the California statute purporting to consent to the proceeding was repugnant to the "impairment of the obligation of contracts" clause of the Federal Constitution art. 1, § 10. The Court did not consider the point well taken, and held that the proceedings under consideration were valid, since the State had consented. Even though the point is not discussed at length in the Court's opinion, the case is direct authority for the proposition that consent by a state to proceedings before the Federal bankruptcy court does not constitute an impairment of the obligation of contract as prohibited by the Federal Constitution. Since there is no difference between the wording of the prohibition in the Federal Constitution and the prohibition in the California State Constitution, it follows that like consent would not constitute an impairment of the obligation of contract under the California Constitution.

Having determined that the court has jurisdiction under the Municipal Bankruptcy Act; that the former proceedings in the United States District Court are not res judicata of this proceeding; that the case pending in the California state court is no bar to it; and that the Act is valid as applied to appellants, we now approach the merits of this case with the consideration of the status of the R.F.C. It is quite apparent that if R.F.C. is to be considered in all respects as a simple owner of District bonds it must be considered along with other bondholders "in the amount of the securities affected by the plan" to consent or object to the plan of composition. If R.F. C. is to be considered in all respects as a mere loaner of money to the District, it cannot consent for the securities purchased by the money so loaned. If R.F.C. cannot so consent, the question arises, can anyone else consent for such securities? Other incidental questions will appear. Whatever may be the answers or the effect of the answers to these questions upon the right of this suit to be maintained, the answers will have a profound effect upon the point of solvency.

## Is Reconstruction Finance Corporation a Creditor Affected by the Plan?

Appellants' argument on this point can best be stated by a quotation from their opening brief: "The real question is whether or not Reconstruction Finance Corporation made a loan to the district. If it did, then the bonds which it holds are either effectively retired or are collateral to the loan, and the district's obligation is the amount of the loan, and the obligation owing to the R.F.C. is not affected by the plan of composition. In other words, what 'is the obligation of the district to the R.F.C.? If it is an obligation according to the terms of the deposited bonds, the district does not owe the R.F.C. anything on a loan. If there is a loan, the district has no obligation on the bonds except to the extent that they might possibly be enforced as security in liquidating the loan."

Appellants point to the language of resolutions by the R.F.C. and the District and

of correspondence between the parties, and cite numerous cases which they contend hold, in effect, that the transaction was a straight loan, secured by the collateral of the old bonds. They argue that the transaction being a "loan," it follows that R.F.C. cannot be classified as a "creditor affected by the plan" within the contemplation of the statute.

Whether or not the District was insolvent, it is apparent that there was much continuing uneasiness upon this subject among bondholders, residents and officers of the District from the early part of 1931. Two bondholders' protective agencies were formed, which two later merged into Merced Irrigation District Bondholders' Protective Committee.

It may be safely stated that from the date last mentioned up to the first suggestion of relief through R.F.C. and thereafter, the problem has been a continuous one of refinancing for the District. No true account of the problem or understanding of what has been done is possible solely by the method of separate and detached analysis of each step taken.

It will not do to merely examine the foundation and framework of the structure as separate and detached parts of the whole. When we view it from the perspective it will be seen that the end sought throughout the encountered vicissitudes was an arrangement with a governmental agency, whereby government money should be procured upon the security of the District and its assets for the relief of the District's straitened circumstances.

Appellants make the most of the use of such terms as "loan", "borrowers", "security", and "owner" in the implementing of this consummation, seeking to place R.F.C. and the District in strait-jackets of restricted definitions. We shall see that any apparent inconsistency is dispelled through specific definitions in the Bankruptcy Act and through a comprehensive view of the whole proceeding.

We shall therefore proceed to more closely examine what has been done and more particularly what the written documents passing between R.F.C. and the District really mean.

We have quoted in our preliminary statement of the facts of this case, the text of one of the conditions on which the "loan" from R.F.C. to the District was made, showing that the old securities should be kept alive until refinancing was complete.

We referred to the fact that arrangements were made to carry out the plan contemplated by the resolutions. As part of these arrangements, on August 14, 1935, a contract was executed by R.F.C. and the District, referring to and incorporating the Resolution, and further reciting:

"The Corporation [R.F.C.] may make disbursements at any time it is willing to do so for the purpose of acquiring any portion of the Old Securities evidencing the District's outstanding indebtedness which is or may be available for refinancing, or rights of interests in or to such Old Securities, on the basis of the payments to be made for Old Securities under the provisions of the Resolution and if and when such disbursements are made * * * they shall be and constitute advances from the loan authorized in said Resolution.

"Until the Old Securities acquired and held by the Corporation by reason of or in connection with such disbursements, are exchanged for New Bonds issued by the District, or are otherwise refinanced as provided in said Resolution, they shall at all times continue to be and constitute obligations of the District for the full face amount thereof.

"When all of the Old Securities are made available for refinancing and are acquired by the Corporation, the reduction in the District's indebtedness will be effected to the extent and in the manner provided in the Resolution, and the parties hereto will do all acts and take all steps and proceedings necessary or appropriate to facilitate and accomplish expeditiously such result. * * * *"

On September 16, 1936 the District and R.F.C. executed a "Bond Purchase Contract." In this agreement R.F.C. agreed to purchase the refunding bonds of the District. This agreement again contained the provision that R.F.C. may keep any part of the old indebtedness alive, "for the sole purpose of maintaining a parity between itself and the holders of indebtedness of said Borrower who have not agreed to enter into the refinancing scheme of said Borrower, or for any other purpose."

To date, the refinancing has not been completed because the dissenting bondholders have not turned in their bonds. The old bonds have not been cancelled or surrendered to the District, nor have refunding bonds been issued to R.F.C. All the old bonds acquired by R.F.C. have been registered in its name as owner and since their

delivery have been under its sole control, subject to conditions about to be mentioned.

As well-stated by the trial court [25 F. Supp. 981, 984]: "No one can read the record of the negotiations between the governmental agency and the insolvent District and its security holders and fail to conclude that the paramount, imperative and essential feature of the contract was the ultimate and not the immediate retirement of the outstanding bonds which the R.F.C. acquired."

It seems clear to us that R.F.C. agreed to furnish money to the District to refinance its entire bonded debt at $515.01 for each $1000 bond. The arrangement was subject to the condition that all old securities should be purchased and held by R.F. C. until R.F.C. was satisfied that refinancing was complete. During this time, the old securities were to be kept alive and outstanding. When the refinancing was complete, then and then only was R.F.C. under the duty of buying and accepting refunding bonds, and surrendering the old securities for cancellation.

The Bankruptcy Act under which these proceedings were brought contains the following definitions, 11 U.S.C.A. § 402:

"The term 'creditor' means the holder of a security or securities."

"Any agency of the United States holding securities acquired pursuant to contract with any petitioner under this chapter shall be deemed a creditor in the amount of the full face value thereof."

"The term 'security' shall include bonds, notes, judgments, claims, and demands, liquidated or unliquidated, and other evidences of indebtedness, either secured or unsecured, and certificates of beneficial interest in property."

"The term 'security affected by the plan' means a security as to which the rights of its holder are proposed to be adjusted or modified materially by the consummation of a composition agreement."

Furthermore, subdivision j of Sec. 403 of the same Act provides:

"The partial completion or execution of any plan of composition as outlined in any petition filed under the terms of this title by the exchange of new evidences of indebtedness under the plan for evidences of indebtedness covered by the plan, whether such partial completion or execution of such plan of composition occurred before or after the filing of said petition, shall not be construed as limiting or prohibiting the effect of this title, and the written consent of the holders of any securities outstanding as the result of any such partial completion or execution of any plan of composition shall be included as consenting creditors to such plan of composition in determining the percentage of securities affected by such plan of composition."

It cannot be questioned that under the express terms of the Act, R.F.C. as holder of the old securities, is a "creditor affected by the plan" to the full face amount of those old securities. Appellants' entire argument is based upon the erroneous assumption that the old securities are no longer outstanding, or that they belong to the District and are pledged as collateral for the "loan" from R.F.C. to the District. From what we have said above, it is clear that R.F.C. is the holder of the old securities, and that they are still outstanding.

Nor can it be questioned that Congress has absolute right to define the term "creditors" and designate what claims are provable in bankruptcy proceedings. City Bank Farmers Trust Co. v. Irving Trust Co., 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324.

Appellants argue that subdivision (j) of Sec. 403 above quoted does not apply to the instant case, for three reasons. We quote the reasons from the brief of appellant Florence Moore:

"(a) It is limited expressly to cases in which refunding bonds have been issued. None have been issued here.

"(b) It does not purport to allow holders of the refunding bonds to vote, or otherwise act, as creditors beyond the amount of the refunding bonds held.

"(c) Although it applies to refunding bonds issued before the filing of the petition, it does not purport to operate retrospectively."

It is true that the section quoted above does not specifically refer to a situation where refunding bonds have not been issued, but reason compels us to the conclusion that if the issuance of refunding bonds shall not be construed as limiting or prohibiting the effect of the title, surely a like situation would be true where the plan has not been carried through to completion.

The following excerpt from the Congressional Record of Debates, 75th Congress, 3rd Session, makes it clear that this was the intent of Congress:

"Mr. Pepper, on offering the amendment, Section 83, sub. j:

"'Mr. President, I will state the purpose. Let us assume that under the existing municipal bankruptcy law a municipality which had engaged in a partial refunding of its obligations desired to make some adjustment of its total obligations outstanding. Under the existing municipal bankruptcy law, which was passed after its amendment occurred at the last session, that municipality could obtain the consent of 51 percent of its outstanding obligees, and present that to the court along with a plan of composition, and if two-thirds of all the obligees agreed to that plan of composition, then it would be possible for the court, by the approval of that plan, to put it into effect, and the plan would bind all the obligees. That is the provision of the existing municipal bankruptcy law.

"'Before that municipal bankruptcy law went into effect there were a number of municipalities which had engaged in a partial refunding, or, rather, had inaugurated a refunding program, which had been partially completed, but, in the absence of any laws to aid them, they were completely at the mercy of a recalcitrant minority of their obligees as to whether or not that refunding plan could succeed.

"'A very few bondholders could prevent the accomplishment of the whole refunding program, no matter if 98 percent of the obligees might desire that it go into effect.

"'Thus we found, after the passage of the municipal bankruptcy act, that it only provided that municipalities might have access to that act for the adjustment of their total outstanding obligations. When a case arising in West Palm Beach, Fla., went up on appeal, the United States Circuit Court of Appeals for the Fifth Circuit held that the municipal bankruptcy law was not applicable to that kind of a situation. That the consent of even 98 percent of the bondholders could not get the case into court for a fair consideration by a Federal judge. So my amendment merely proposes that municipalities coming within that class shall have resort to the Federal Court, through the means of the municipal bankruptcy law, for a fair adjustment of their obligations upon the same principles that are laid down by the original Municipal Bankruptcy Act.'"

The case arising in West Palm Beach, Fla., referred to by the proponent of the amendment in the above quotation, is quite probably the case of In re City of West Palm Beach, 5 Cir., 96 F.2d 85, relied upon strongly by appellants in their contention that R.F.C. is not a "creditor affected by the plan". It is certain that the amendment was enacted to avoid the result of the West Palm Beach decision.

It is likewise true that the section does not specifically state that the holders of the refunding bonds shall be deemed creditors to the full face amount of the old securities. However, the section does provide that the partial completion of a plan "shall not be construed as limiting or prohibiting the effect of this title". Words could not be plainer. Congress intended by this enactment to provide that partial completion of a plan of composition, even in a situation where refunding bonds have already been issued, shall not be construed as changing the status of the parties.

Appellants' third argument as to the inapplicability of subdivision (j) is based upon the fact that the subdivision was not enacted until after R.F.C. had acquired the bonds. This argument, of course, is premised upon the assumption that the old bonds were extinguished before the section was enacted. We have shown this premise to be erroneous.

In Luehrmann v. Drainage District, 8 Cir., 1939, 104 F.2d 696, certiorari denied under the name of Haverstick v. Drainage Dist. No. 7, November 6, 1939, 308 U.S. 604, 60 S.Ct. 141, 84 L.Ed. 505, the Circuit Court for the Eighth Circuit had under consideration the same argument as that advanced by the appellants here. In the cited case, as here, the District had applied to R.F.C. for a loan to enable it to refinance, and the loan had been authorized. After the passage of the old municipal bankruptcy act (later held unconstitutional by the Ashton case, supra) R.F.C. disbursed funds amounting to approximately $.26 on each dollar of principal indebtedness held by the bondholders' committee, which then amounted to approximately 98% of the outstanding bonds. There, as here, it was provided that the outstanding bonds should not be cancelled until refinancing was complete. None had been cancelled. The question on appeal from a decision of confirmation of the plan under the new municipal bankruptcy act was whether or not the old bonds were still outstanding. We quote from the decision of the court (pages 700, 701 of 104 F.2d):

"At the outset the Reconstruction Finance Corporation undertook to make a refunding loan to the district upon the application of the bonding committee which procured the acceptance of a large percentage of bondholders, evidenced by the deposit of their bonds. * * * Of course the Reconstruction Finance Corporation was not authorized to make a loan subordinate to prior outstanding liens, nor did it undertake to do so. In order to preserve its rights the bonds controlled by the bondholders' committee were transferred to the trustee Ritter, who was succeeded by Chapman, so to be held until the transaction could be closed with safety to the Reconstruction Finance Corporation. Meantime the Readjustment Act of May 24, 1934, 11 U.S.C.A. §§ 301–303, became operative before any disbursements had been made and all future transactions between the Reconstruction Finance Corporation and the district were based upon an acceptance of the application of that Act to the financial needs of the district. Accordingly disbursements were made upon the basis of 25.879 cents on the dollar to all accepting bondholders, but the bonds were still retained as collateral security in the hands of the trustee. This was the situation when the Act of 1934 was declared invalid.

"Upon passage of the Composition Act of 1937, the petition of the district was renewed and the present proceedings in composition were instituted. The trustee Chapman, acting for the bondholders who had accepted the original offer, filed acceptance of the proposed plan; 88.5% of judgment and other creditors did likewise; all such, in view of the expected composition settlement, received the same amount of 25.879 cents on the dollar of their claims. No bonds in the hands of the trustee have been cancelled. They are still outstanding obligations of the district unless and until they are finally liquidated by satisfaction of the obligations to the Reconstruction Finance Corporation, sought to be effected through the proceeding in composition now before us. * * *

"The objection that the bondholders (and, incidentally the judgment creditors) have scaled their debts by accepting 25.879 cents on the dollar in settlement of their claims, and therefore cannot be counted as acceptors of the debt readjudgment plan, is very closely connected with the question of the solvency or insolvency of the district. Undoubtedly, if the Reconstruction Finance Corporation loan had been conducted as an entirely disconnected transaction, and the disbursements to the creditors of 25.879 cents on the dollar had been made as unconditional purchases of the claims, both of these objections would have been entitled to weight. But it is apparent from the record and from the findings of the court that the readjustment loan made by the Reconstruction Finance Corporation must be considered in connection with the two applications for readjustment and composition in bankruptcy under the Acts of 1934 and 1937. No disbursements were made by the Reconstruction Finance Corporation until the initial steps had been taken by the district under the first of these Acts, and it is apparent that all parties to the transaction acted upon the understanding that the disbursements made were in conformity with the plan of readjustment then in process under the first Act, and later continued in substance under the second Act. For this reason we think these classes of bondholders and judgment creditors so far retained their original status as entitled them to be counted as acceptors of this composition plan."

▇ We agree entirely with the decision of the Court in the Luehrmann case, supra, and hold that R.F.C. is entitled to be classed as a "creditor affected by the plan."

▇ Appellants argue, however, that in any event R.F.C. is not entitled to be recognized as a creditor "because it has not filed a claim."

Suffice it to say that the petition filed in these proceedings alleged ownership of the bonds by R.F.C. and that R.F.C. as such owner, consented to the plan of composition. The Court found these allegations to be true, and the findings are supported by the evidence. In these circumstances, it is immaterial, if true, that no claim was filed.

### Good Faith of the District

▇ Appellants' Second Proposition is entitled "Petitioner is barred from obtaining confirmation of the proposed plan of composition by reason of its lack of good faith and constructive fraud." They contend that the plan is not submitted in good faith and that the District, by transfer of money out of one fund into another and by other inaccurate financial statements, has fraudulently represented the District to be in bad condition.

670

We will not dispute the premise that the Court will refuse relief where insolvency is based upon fraudulent diversion of moneys. We think it unnecessary to say what effect upon the adjudication of bankruptcy the discovery of fraud would have where it would not affect the question of insolvency, for no fraud is here revealed. It seems clear that the alleged misappropriation and erroneous figures used in the District's accounting may be resolved into questions of bookkeeping.

One phase of "lack of good faith" or "constructive fraud" contended for by appellants is that the District has diverted $717,932.50 from the bond fund. We have checked the basis of this charge in the evidence. Mr. E. E. Neel, the auditor of the District explains as follows: "I have made a computation for the purpose of determining the total amount that would be in the bond fund today as the result of the collections on the levy of 1932-33 after December 31, 1932 and as a result of the collections of delinquent taxes that were delinquent as of December 31, 1932 under prior levies which embrace bond service and find the total to be $717,932.50 which includes $320,272.93 of 1932-33 collections. That represents all collections of all delinquencies whether or not the purpose of the levy had been fulfilled and completed."

These moneys have gone into the general fund, and since all bond and interest maturities were paid in full up to July 1st, 1933, only moneys collected on the 1932-33 levy for bonds and interest which has gone into the general fund would, in any circumstance, have been put there erroneously. This could not exceed the sum of $320,272.-93.

The collections were not sufficient to meet the maturities of January 1, 1933. Thereafter the collections brought in more than sufficient, so the payments due January 1, 1933, were met and the balance in the bond fund was transferred to the general fund, out of which maturities were paid to July 1, 1933. Since this last date dissenting bondholders have been paid nothing.

It will be remembered, however, that under the first plan it was provided that "no payment is to be made upon the coupons which were due July 1st, 1933, and that the payment of the bonds and coupons which were due January 1st, 1933, is to constitute in effect full payment of interest falling due during the entire year."

This policy has been continued through all of the subsequent proceedings. Thus it would appear that the charge of bad faith fails entirely, although the transfer of this $320,272.93 may have been in the face of bondholders' rights. We do not understand that every such error precludes the success of the composition. It is quite evident that the proportionate amount of this sum to which the dissenting bondholders would be entitled would be comparatively small.

Another claim made by appellants is succinctly stated in their brief: "Petitioner [District] in violation of the rights of its bondholders, arbitrarily refused to levy any taxes for the purpose of paying accrued interest and matured bonds of the district for the years 1933, 1934, 1935, 1936, 1937 and 1938." There is little, if any, attempt in the briefs to dispute or minimize the evidence given on behalf of the District to the effect that the great depression had laid a heavy hand upon the District and its inhabitants. Delinquencies in the collection of taxes were high and buying of the land by the District for such delinquencies reduced the acreage subject to taxation. Sales were difficult to negotiate. Continued levying of taxes would result in "pyramiding" debts upon the diminishing taxpaying acres. The District took advantage of a law enacted for the purpose of relieving just such distress and authorizing the reduction or suspension of levying taxes to service bonds, upon a proper showing. § 11 Districts Securities Commission Act, St.Cal.1931, p. 2267, Cal.Stats.1933, Chap. 60, p. 355; 1935, Chap. 36, p. 359, and 1937, p. 491. There is no showing here of fraud or lack of good faith.

In connection with this item appellants make statements that comparatively the District water users are getting cheap water, the intimation being that the land could stand either higher taxes or tolls or in some other manner revenues could be added. Of course, such additional costs would come from the same lands that showed heavy and increasing delinquencies for the taxes levied and "pyramiding" and proceeded to an alarming degree, and we cannot appreciate how or in what manner a change of method to get the money from the same source could be successful.

Appellants contend that the District has overstated its liabilities in three different items. The first is in the sum of $824,684 which has been paid to R.F.C. as interest upon advances made by it. This amount

is carried on the balance sheets of the District as an interest expense in the nature of a refinancing charge, and no deduction has been made from the amount of outstanding matured obligations. The theory of appellants is that this sum was in fact a payment on account of matured coupons, and hence should have been so credited. The second item complained of is the sum of $168,582 paid as interest to depositing bondholders. This, too, has been carried as a charge of the refinancing, and no credit has been made on outstanding matured obligations. The third item is the sum of $129,100, which is set up as a liability for interest on matured registered coupons. Appellants state that this amount "never was owed". The theory is that the payment of interest to R.F.C. was in fact a payment on account of matured coupons, and that it was therefore improper to charge interest against these coupons after the date of such "payment".

We need not determine here whether or not the payments of interest should have been credited to the outstanding matured coupons, for no showing has been made that there was any bad faith on the part of the District in its method of keeping its books. There was no concealment whatsoever as to the payments themselves.

The complaint, if any, that appellants might have, is that these payments affected the solvent or insolvent condition of the District. We shall discuss this in connection with our discussion of the merits of the plan.

It is charged that the bond liability is overstated in the District's balance sheet as of November 1, 1938, by the sum of $387,-000. Again this is a bookkeeping item wholly. The overcharge represents a total par value of unpaid matured bonds and is charged as current liabilities. There is a charge-off of this item under capital liabilities. The total liabilities shown on the balance sheet is not affected. It has never been claimed that the principal bonded indebtedness of the District was more than that of the original issue, $16,191,000.

It is charged that the balance sheet of November 1, 1938, should have shown an asset of $340,000, being a tax levy for 1938–1939. It appears that a tax levy of $337,369 was authorized by the District and approved by the California Districts Securities Commission for operating costs for the calendar year 1939. Neither the levy nor the costs appear on the balance sheet. It is obvious that if they had appeared they would offset each other.

The next item criticized in the November 1, 1938, balance sheet is in regard to the purchase of Crocker-Huffman water rights. The District purchased the Crocker-Huffman Land and Water Company assuming certain obligations to deliver water at a very low figure. The District desired to rid itself of these obligations and purchased them outright for $1,020,000 at $60,-000 per year, and the sum of $840,000 has been paid. It is claimed that this sum should have been carried on the District's books as "capital expenditure" rather than as "operation and maintenance". This may be so. We do not understand how this entry can be of any importance here. As a matter of realism the item of $60,000 per year outgo is an operation and maintenance expense which is important in the consideration of the ability of the District to pay its debts when they fall due.

The same criticism is directed to the fact that the District has paid annually $10,000 to $11,000 on bonds of three Drainage Districts taken over by the District, charging the sum to operation and maintenance instead of to capital expenditure. The aggregate of such expenditures has not been set up as an asset. We answer this as in the last paragraph.

Since we are not in accord with the criticisms above referred to we do not follow to appellants' conclusion that there is a material overstatement of bond fund deficit in the District's calculations.

Appellant asserts that: "The District's proposal of a plan reducing creditors' claims by half, when all it needs is extension of time, is itself bad faith, under the authorities".

This assumption of both premise and conclusion presents really a question of insolvency.

Before discussing the solvent or insolvent condition of the District and the fairness of the plan, we shall consider other contentions made by the appellants as to why the decree of the District Court should not be affirmed.

### Classification of Claims

Appellants state as their Fifth Proposition, "The Judge erroneously classified all of the claims as of the same class."

The applicable part of Section 83, sub. b, of the Bankruptcy Act, 11 U.S.C.A. § 403, sub. b, is as follows: "* * * the judge shall classify the creditors according to the nature of their respective claims and interests: Provided, however, That the holders of all claims, regardless of the manner in which they are evidenced, which are payable without preference out of funds derived from the same source or sources shall be of one class. The holders of claims for the payment of which specific property or revenues are pledged, or which are otherwise given preference as provided by law, shall accordingly constitute a separate class or classes of creditors.".

Appellants then proceed to state that Section 52 of the California Irrigation District Act provides that when matured bonds and due coupons on bonds are presented to the treasurer of the District he must pay the same if there is money in the proper fund or if not he must register the same. They then immediately arrive at the conclusion that: "Whatever may be the actual order of presentation of matured bonds and coupons to the Treasurer for payment under § 52, this much is clear, that under California law a *preference by law* is given thereby and the bankruptcy court can only apply and use the bond funds and other trust funds and property belonging to the bondholders upon the payment thereof in the order of such presentation. Such application as between a bondholder having an unmatured bond and a bondholder having a matured bond would require payment in full of the matured bond, if presented, before any trust funds could be applied upon payment of the unmatured bond. This seems to be the positive injunction of Ch. IX * * *" [Italics theirs.]

It does not seem so to us. We are convinced that appellants have erred in their reasoning that the registration gives a preference by law to the due but unpaid obligations that is different in any manner from the obligation of the bond contract as to due dates. The error probably arises from the following statement in the opinion of Bates v. McHenry, 123 Cal.App. 81, 10 P.2d 1038, 1040: "We do not need to set forth the method of procedure relating to the payment of warrants, further than to state that stamped and unpaid interest coupons or bonds follow the same proce-

dure, and the holders thereof are entitled to payment immediately upon funds coming into the hands of the treasurer of the district, available for such purpose, and in the order in which they are registered."

Bates v. McHenry, supra, to use the words of appellants, was a suit "to compel payment of interest coupons at a time when there were not funds sufficient to pay all the matured interest coupons. The Court directly held that it was the duty of the Treasurer to do two things: 'He must either pay the bond or interest coupon when presented, or register the same. The irrigation laws do not confer upon the treasurer of the district any authority to prorate payments.'"

■ Of course every bond of different maturing date and every interest coupon is in a sense in a class by itself, but no one would contend that this difference is within the meaning of the bankruptcy law a mark for classification. It is stated in 10 Remington on Bankruptcy, 1939, § 4361, p. 250, that "* * * the fundamental classification must be in accordance with the source or fund out of which the payment is intended to be made." Registration effected no change in the source out of which the payment of the bonds and interest was intended to be made.

Appellants cite a number of cases in support of their theory and emphasize the case of El Camino Irrig. Dist. v. El Camino Land Corp., 12 Cal.2d 378, 85 P.2d 123, and Provident Land Corp. v. Zumwalt, 12 Cal.2d 365, 85 P.2d 116. So far as these two cases may seem to touch the subject at hand, they decide that equitable principles may be applied to the payment of bonded indebtedness of irrigation districts which have become hopelessly insolvent and in which there is no longer a theoretical inexhaustible taxing power. The cases have nothing whatever to do with classification of debts in a bankruptcy proceeding.

We have been cited no cases in which it is held that bonds issued under authority of the California Irrigation District Act have been divided into classes, and such cases as Selby v. Oakdale Irrig. Dist., 140 Cal.App. 171, 35 P.2d 125, and Shouse v. Quinley, 3 Cal.2d 357, 45 P.2d 701, are authority against such a conclusion.

■ When § 52 of the California Irrigation District Act is related to § 61a of

the same Act [both of which we place in the margin] [1] it may be seen that the two must be considered together as a plan for the orderly record of owners of defaulted obligations and for their notification when the fund permits of payment. Due dates are definite for all unmatured bonds and undue interest, but after presentation and default of payment, of course, no date is fixed for payment. Owners would be greatly inconvenienced if there were no machinery for notification when the funds became sufficient to meet the delinquencies. See Clough v. Baber, Cal.App., 100 P.2d 519.

 There would seem to be other reasons why appellants' theory is erroneous. We merely suggest certain principles that may be extended. That the power of Congress in the field of bankruptcy "* * * is both unlimited and supreme is not questioned" Sturges v. Crowninshield, 4 Wheat. 122, 192, 4 L.Ed. 529.

Rights "* * * must be decided by the Bankruptcy Act, since it is superior to all state laws upon the subject." Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133, 76 A.L.R. 1198; New York v. Irving Trust Co., 288 U.S. 329, 53 S.Ct. 389, 77 L.Ed. 815. We find nothing in the Act justifying the classification suggested by appellants.

In referring to classification of certain claims under Section 77 B of the Bankruptcy Act, the Court said in Re Palisades-On-The-Desplaines, 7 Cir., 89 F.2d 214, 217: "Such classification, of course, should not do substantial violence to any claimant's interest, nor should it uselessly increase the number of classifications unless there be substantial differences in the nature of the claims."

We agree with the statement contained in the brief of Amici Curiae, "It is obvious that if bankruptcy Courts are to recognize every conceivable claimed 'priority' or

---

[1] "§ 52. Upon presentation of any matured bond of the district, the treasurer shall pay the same from the bond principal fund, and upon presentation of any matured interest coupon of any bond of the district, the treasurer shall pay the same from the bond interest fund. If money is not available in the fund designated for the payment of any such matured bond or interest coupon, it shall draw interest at the rate of seven per cent per annum from the date of its presentation for payment until notice is given that funds are available for its payment, and it shall be stamped and provision made for its payment as in the case of a warrant for the payment of which funds are not available on its presentation. * * * ".

"§ 61a. Whenever any warrant of the district payable on demand is presented to the treasurer for payment when funds are not available for the payment thereof, it shall thereafter draw interest at a rate to be determined by resolution of the board of directors, not, however, to exceed seven per centum per annum, until public notice is given that such funds are available. Upon the presentation of any such warrants for payment, other than warrants issued under the provisions of section 61 hereof, when funds of the district are not available to pay the same, the treasurer of the district shall endorse thereon the words 'funds not available for payment', with the date of presentation and shall specify the interest that such warrants shall thereafter bear and shall sign his name thereto. He shall keep a record showing the number and amount of each such warrant, the date of its issuance, the person in whose favor it was issued, and the date of its presentation for payment. Whenever there is sufficient money in the treasury to pay all such outstanding warrants or whenever the board of directors shall order that all such warrants presented for payment prior to a certain date, be made and there is sufficient money available for such payments, the treasurer shall give notice in some newspaper published in a district, or, if none is published therein, then in some newspaper published in the county in which the district or any portion thereof is situated * * * stating that he is prepared to pay all warrants of the district for the payment of which funds were not available upon their original presentation, or all such warrants which were presented for payment prior to the date fixed by the board of directors, as the case may be * * *. Upon the presentation of any warrant entitled to payment under the terms of such notice, the treasurer shall pay it, together with interest thereon at the rate specified by the board of directors, from the date of its original presentation for payment to the date of the first publication or posting of said notice * * *. The treasurer shall enter in the record hereinbefore required to be kept, the dates of the payment of all such warrants, the names of the persons to whom payments are made and the amount paid to each person."

'preference', the entire purpose of Chapter IX would fail."

■ 'We are convinced that there is no phase of unfairness to a plan of composition under the Bankruptcy Act by reason of including in one class matured and registered and unpaid bond obligations with unmatured bond obligations all of which for payment in regular course depend upon the taxing power of a district. It places all such creditors whose claims are payable from the same source on a basis of absolute equality. See Luehrmann v. Drainage Dist., supra.

### Does Act Prefer Junior Liens to Senior Liens?

■ In our discussion of appellants' proposition Tenth, we stated that we would leave for later discussion their point entitled, "As here applied, the Bankruptcy Act prefers junior liens to senior liens, and discriminates among liens of equal rank."

The point is without merit. We quote appellants' argument:

"Much of the land within the Merced Irrigation District is subject to mortgages securing debts owing to banks and individuals.

"In addition to being encumbered by the bonds of Merced Irrigation District, most of the lands in the district are burdened with bonds of one or more other public agencies. Wholly or partly within Merced Irrigation District are to be found five road districts, three high school districts, thirty-five grammar school districts, one mosquito district, three drainage districts, and three cities, all of which have outstanding bonds collectible by assessment upon lands in the respective districts mentioned. In addition, the county itself has outstanding a large amount of bonds. Under the law of California the bonds of most of the foregoing public agencies are of equal rank. * * * The result therefore of the application of Chapter IX of the Bankruptcy Act to the petitioner is to prefer junior claims to senior claims, and to discriminate among claims of equal rank."

In other words, the contention is that because some of the lands of the District are subject to mortgages or bonds of other independent and distinct public agencies, the effect of this proceeding is to prefer junior liens and to discriminate among claims of equal rank. The conclusion is not justified. The obligations of mortgages or bonds of overlapping agencies are simply not affected by the plan. It is true that a scaling down of the obligations of this District should leave the taxpayer more money with which to pay his other obligations, but this is not a preference of liens.

### Does Decree Unlawfully Take Trust Funds and Vested Rights Belonging to Appellants?

The contention of appellants under their Sixth Proposition is that "the money belonging to the bond funds are trust funds in which the appellants had a vested right" and that certain other assets of the District are "trust properties".

In treating this phase of the case, it is necessary to treat of various points of fact and law. In so far as appellants' conclusion is based upon the theory that the decree destroys liens or preferences, our holding upon the subject of the classification of claims sufficiently indicates our divergent view.

Appellants also object to the plan because the bondholders are to be paid cash for their bonds, leaving the properties of the District intact. This, they argue, is a "taking property belonging to the creditor and giving it to the debtor".

■ This argument is two fold; first, it relates to the "bond fund" and second, it relates to the other so called "trust properties" of the District.

For a full understanding of appellants' position we turn to the text of the proposed plan. We there find: "That outstanding bonds of said district in the total principal sum of Sixteen Million, One Hundred Ninety Thousand Dollars ($16,190,-000.00), with all interest coupons appurtenant thereto and right to interest due on said bonds as of July 1, 1933, and subsequently thereto, be retired by the payment in cash for each bond of a sum equal to 51.501 cents for each dollar of principal amount thereof. * * * That such payment be made out of a loan of Eight Million Three Hundred Thirty-eight Thousand Eleven and 90/100 Dollars ($8,338,011.90) heretofore authorized and allocated for that purpose by the Reconstruction Finance Corporation, an agency of the United States of America to or for the benefit of the Merced Irrigation District. That to evidence said loan Merced Irrigation District issue and deliver its refunding bonds in the principal sum of Eight Million Three Hun-

dred Thirty-eight Thousand Eleven and 90/100ths Dollars ($8,338,011.90) to said Reconstruction Finance Corporation and accept in exchange for all or any part thereof, on the basis aforesaid, such bonds of petitioner held or purchased by said Reconstruction Finance Corporation, to the end that the district will reduce its outstanding bond indebtedness from the principal sum of Sixteen Million One Hundred Ninety Thousand Dollars ($16,190,-000.00) to the principal sum of Eight Million Three Hundred Thirty-eight Thousand Eleven and 90/100ths Dollars ($8,338,011.-90), bearing interest at the rate of four percent (4%) per annum."

It is not argued that it would be improper for the court of bankruptcy to distribute the bond fund ratably among the bondholders, but appellants complain that instead of being paid out of this fund, they are to be paid with the moneys loaned by the R.F.C. to the District.

In our discussion under the heading "Good Faith of the District" we held that the greatest sum that could possibly be claimed as being transferred to the general fund out of the bond fund is $320,272.93.

Under the plan the bondholders are to receive $.51501 on the dollar, or the sum of $8,338,011.90, in the aggregate. Appellants' entire argument as it applies to the bond fund would fall if the mechanics of the plan contemplated that $320,272.93 of the $8,-338,011.90 to be paid to the bondholders would be paid from the bond fund and the balance from moneys furnished by R.F.C. In this situation, then, the balance of the amount of the R.F.C. loan could be retained by the District for purposes of operation, etc. There is nothing in the plan that stands in the way of this being done. It is contemplated by the resolution that the bondholders should be paid from a fund of $8,338,011.90 furnished by R.F.C., but this does not mean that the District would not disburse the bond fund moneys first and make up the balance out of R.F.C. moneys. Appellants' reasoning does not seem sound to us.

We now come to the assertion that certain other properties of the District are "trust properties" and cannot be taken from the bondholders by the bankruptcy court. Such properties include "Tax deeded lands; rentals, including water tolls per year; tax sale certificates; and in addition, all assets not needed for the operation and maintenance of the district".

Reliance is had upon Section 29 of the California Irrigation District Act, which reads in part: "The legal title to all property acquired under the provisions of this act shall immediately and by operation of law vest in such irrigation district and shall be held by such district in trust for and is hereby dedicated and set apart to the uses and purposes set forth in this act".

Following the citation of this Section of the California Irrigation District Act, appellants set out in their opening brief an excerpt from the opinion in Clough v. Compton-Delevan Irrigation District, 12 Cal.2d 385, 85 P.2d 126, 128, wherein the Court referring to Section 29 said: "The property is by this language impressed with the public use, and the trust is for all the purposes of the act. Payment of the bondholders is such a purpose * * *".

As is often the case, the true meaning of such a general statement in the opinion is revealed only through a consideration of the whole opinion. It is well to consider the following additional text of the opinion from which appellants quote:

"His [plaintiff's] theory seems to be that the original loan of money to the district created both an equitable lien and a resulting trust under section 853 of the Civil Code, reinforced by section 29 of the Irrigation District Act, Gen.Laws 1931, Act 3854; that this trust is in favor of the bondholders as beneficiaries; that the beneficiary of a trust has an estate of inheritance * * *. There is no authority supporting the main proposition for which plaintiff contends, and the entire argument runs counter to the terms of the statute and the holdings of our cases.

"There is, first, no lien nor resulting trust arising from the purchase of the bonds. The statute fully defines the relationship of bondholders, district and landowners. Nowhere does it declare that the bondholder has a lien on the land itself, and it certainly does not recognize any trust for his sole benefit. Section 29 provides that the title to land acquired by the district shall vest in the district, 'and shall be held by such district, in trust for, and is hereby dedicated and set apart to the uses and purposes set forth in this act.' The property is by this language impressed with the public use, and the trust is for all the purposes of the act. Payment of the bondholders is such a purpose, as we have held in the Provident Land Corporation Case, supra; but there are other purposes

as well, and the bondholders cannot be considered exclusive beneficiaries, even if the doubtful assumption be made that they, as individuals, are beneficiaries at all. Indeed, it is futile to attempt to discover the 'beneficiaries' of the statutory trust created by section 29."

It seems apparent that appellants are wrong on both the first and second branches of this "Sixth Proposition".

## Insolvency, of the District
### and
### Fairness of the Plan

We have left for final consideration appellants' Third Proposition: "Petitioner herein is not 'insolvent or unable to meet its debts as they mature'", and their Fourth ·Proposition: "The plan of composition is not fair, equitable or for the best interests of the creditors, and it is discriminatory", as the determination of one will be dependent to a large extent upon the other.

A portion of appellants' argument under their "Third Proposition" is based upon the same assumption as their argument under the point entitled "The Reconstruction Finance Corporation is not a creditor affected by the plan of composition", that the old securities were extinguished by the transaction with R.F.C. This argument falls with our holding above that the old securities are still outstanding.

However, an additional claim is made by the appellants that even considering the old securities as outstanding, still the District was solvent as of the date of filing the petition.

Appellants point to balance sheets of the District, and contend that they show a surplus of assets over liabilities of "well over $10,000,000.00". The assets include cash on hand in the sum of $1,578,446.14. It is asserted that: "There is owing to outstanding bondholders matured interest coupons as of July 1, 1938, in the sum of $496,542.50 and interest on registered bonds and coupons in the sum of $70,459.00, making total interest due $567,001.50." and that "the total past due liability to outstanding bondholders is not over $650,000.00". The appellants conclude that: "Thus, after paying all matured obligations from cash on hand, petitioner would still have $800,000.-00 cash on hand." Appellants also contend that the District's revenues are more than

sufficient to pay principal and interest maturities on the remainder of its debt.

It should be noted, however, that in computing the indebtedness of the District, the appellants assume that matured interest coupons on the outstanding bonds held by R.F.C. are not to be included. The figure of $496,542.50 which they use in their argument is taken from a balance sheet and is labeled

"Outstanding Bonds and Coupons *other than R.F.C.* · * * * Coupons (matured to 7–1–38 inc.)"

[Italics supplied.]

Against this we have the testimony of E. E. Neel, the Auditor and Treasurer of the District: "All obligations at the present time with respect to both maturing bonds and maturing coupons are paid or taken care of with the exception of the bonds and coupons due July 1, 1933 and subsequent. The interest· coupons from July 1, 1933 to and including July 1, 1938 totaled $5,194,925 and the bond principal in default commencing with January 1, 1934 totals up to July 1, 1938 $386,000 and that makes a total of $5,580,925."

In our discussion under the heading "Good Faith of the District", we stated that the only complaint, if any, that the bondholders might have to certain bookkeeping entries, would be that they affected the solvent or insolvent condition of the District.

Two of these items referred to interest payments which had been charged as an expense of refinancing instead of being credited against matured obligations of the District. The two interest payments totaled $993,266.

Assuming without deciding that these payments should have been treated as payments of bond coupons, and therefore should be deducted from the $5,580,925 given by Mr. Neel as the amount of the District's default in bond principal and interest, there remains a default of $4,587,659.

It should also be noted that the figure of $5,580,925 given by Mr. Neel does not include any accrued interest on registered bonds and coupons as provided for by Sections 52 and 61a of the California Irrigation District Act [quoted in footnote 1, supra]. The balance sheets of the District show this to amount to $1,004,887.54. Appellants claim that the sum of $129,100 should be deducted from this figure. As-

suming without deciding that appellants are correct, we have a remainder of accrued interest in the amount of $875,787.54.

Adding this $875,787.54 to the default of $4,587,659, we find that the total default of the District is $5,463,446.

The trial court found that the District "is insolvent and unable to meet its debts as they mature". It further found that "all of the allegations and averments set forth in said petition for confirmation of the plan of composition of bond indebtedness are true". One of the allegations contained in said petition is: "That petitioner is unable to meet its debts as they mature. That it has been continuously in default on both the principal and interest maturing on its bond indebtedness since the 1st day of July, 1933; that the total amount now in default on said bond indebtedness is in excess of Five Million Dollars * * *".

█ The Court's finding that the District is in default in excess of Five Million Dollars is amply supported by the evidence, and with this taken as an established fact the finding that the District is unable to meet its debts as they mature certainly cannot seriously be questioned. The claimed fact that power revenues, etc. of the District will be sufficient to meet the obligations after they have been scaled down as proposed by the plan, does not have any bearing on the question of insolvency of the District.

Appellants, however, argue that the District will be able to pay its scaled down indebtedness in full in a period of thirty years or more and that this proves that the plan is inequitable. Other points of unfairness are also urged. We shall consider the arguments as to the alleged unfairness of the plan in the order in which they are presented in appellants' opening brief.

█ The first contention is as follows: "Assuming that R.F.C. is a creditor of the same standing as the appellants, the plan is unfair because it offers a 4% bond to the R.F.C., but denies a like privilege to the appellants."

Appellants misconstrue the plan and the relationship existing between the District and R.F.C. As we heretofore said, R.F.C. agreed to furnish money to the District to refinance its entire bonded debt at $515.01 for each $1,000 bond. The obligation assumed by R.F.C. was subject to the condition that all old securities should be purchased and held by R.F.C. until R.F.C. was satisfied that refinancing was complete. During this time, the old securities were to be kept alive and outstanding. When the refinancing was complete, then and then only was R.F.C. under the duty of buying and accepting refunding bonds, and surrendering the old securities for cancellation.

As stated by the Supreme Court in Zavelo v. Reeves, 227 U.S. 625, 632, 33 S.Ct. 365, 368, 57 L.Ed. 676, Ann.Cas. 1914D, 664:

"With respect to the money loaned to the bankrupt for use in paying the consideration of the composition, it is perhaps worth while to remark that § 12 of the act [11 U.S.C.A. § 30], in prescribing the time and mode of offering terms of composition, plainly contemplates that a composition in money may be offered, and expressly prescribes that an application for the confirmation of a composition may be made after, but not before, 'the consideration to be paid by the bankrupt to his creditors, and the money necessary to pay all debts which have priority, and the cost of the proceedings, have been deposited in such place as shall be designated by, and subject to the order of, the judge.' And the same section provides that 'upon the confirmation of a composition the consideration shall be distributed as the judge shall direct, and the case dismissed.'

"The act, of course, contemplates that the bankrupt may acquire the money required for the purposes of the composition by the use of his credit."

In the present case R.F.C. has contracted to furnish the money necessary to make the composition effective, and to accept in turn refunding bonds at 4% for the amount of its advance. As holder of the old securities it is treated exactly as are all other bondholders—it will receive 51.501¢ on the dollar.

█ Appellants next complain of the fact that R.F.C. as a creditor has been allowed interest at 4% per annum ever since October 4, 1935. Our holding above that the District was within its rights in using its credit to obtain the money necessary to make the composition effective, carries with it the holding that the District was within its rights in paying interest on the amount advanced by R.F.C. from the date of its advancement.

█ The next contention of appellants is, "The plan is discriminatory because it allowed to bondholders who deposited their

bonds on or before October 4, 1935, 4% interest from date of deposit to that date. * * * No compensation is allowed by the plan to appellants for the period they have waited * * *".

Again appellants misconstrue the plan. The plan simply provides for the payment to each bondholder of a sum equal to 51.501¢ on the dollar of the principal amount of his outstanding bonds. There is no mention in the plan for payment of any interest to bondholders, consenting or objecting. In attempting to effect the composition, the District made the same offer to all bondholders—that it would accept deposit of the bonds immediately, subject to consummation of the agreement between the District and R.F.C. Instead of paying the depositing bondholders immediately, the arrangement was that payment should not be made until funds were available from R.F.C. In the meantime, the District agreed to pay the depositing bondholders interest at the same rate that it would have had to pay R.F.C. had R.F.C. advanced the money. In other words, the corresponding portion of money needed to effect the composition was obtained not from R.F.C. but from the consenting bondholders themselves until such time as the R.F.C. money became available. On the same theory that we have above held that payment of interest to R.F.C. was proper, we hold that it was not improper to pay a like rate of interest to depositing bondholders for the period of time their bonds were tied up without R.F.C. funds being available.

Appellants next contend that the plan is unfair "because it permits the payment in full of bonds or other taxing agencies which are in effect liens against the same territory without requiring any corresponding reduction" and "because it * * * in effect takes property from the bondholder and gives it to a junior encumbrancer, the holder of mortgages and deeds of trust, and to the stockholder, so to speak, viz., the landowner". We have already disposed of both of these contentions in our discussion under the heading "Does Act Prefer Junior Liens to Senior Liens".

The next point is that the plan is unfair "because it takes trust funds and properties belonging to the appellants". This, too, has already been treated.

The remainder of appellants' argument as to the alleged unfairness is based entirely upon the financial condition of the District, it being argued that the plan is "not for the best interests of the creditors".

Regardless of all of appellants' arguments to the contrary, this much clearly appears from the record—The District was hopelessly insolvent and unable to meet its debts as they matured. The bonded debt was $16,190,000 plus millions of dollars in defaulted interest. The District defaulted 62.80% on its last attempt to levy for bond service in September, 1932. At that time the rate was $8.90 per $100. The legal tax rate in September, 1939, if an attempt were made to service the old bond issue would be $68.83 per $100 assessed valuation. Furthermore, the peak amount required for bond service would not be reached until 1951, when $1,280,700 would have to be raised. The amount required for bond service in the year when there was a 60.80% default was only $954,400. Some plan had to be worked out to refinance if anything at all were to be salvaged on the bonds. Therefore the only question before this court is whether or not the 51.501¢ on the dollar is all that could reasonably be expected in all the existing circumstances.

Appellants' arguments, "If inflation comes, the debt of this district * * * will be an inconsiderable factor in its future welfare, because even a minor degree of inflation would enable the district to liquidate its debts fully with comparative ease. A plan, therefore, which now determines in effect that there will be no inflation, but on the contrary probable deflation, is inequitable" and "The sudden change in prices of many commodities owing to the second world war in Europe is a factor which the Court could not have anticipated and is but an illustration of the impossibility of determining whether it is fair to pay off an obligation due in twenty years at 50¢ on the dollar now" are but illustrative of the truth of the statement of the District in its brief, "There is no yardstick that can measure the ability to pay with certainty."

The trial court's conclusions cannot be ignored. We quote the language of the Court in its memorandum opinion [25 F. Supp. 981, 985]: "But it is argued, assuming that the R.F.C. is the owner and holder of about $14,702,000 of existing and outstanding bonds which have been relinquished and voluntarily transferred by their former owners, the plan should be held to be unfair and inequitable to the

bondholders who held out and are now before the court opposing the plan of settlement, because, they assert, the present financial condition of the District does not justify such an extreme paring of the debt structure as the plan accomplishes. We think this contention loses its force when consideration is given to the fact that it was the more than 90 per cent. of the bondholders who took advantage of the R.F.C. composition agreement and transaction which made it possible for the District to save itself from financial ruin and thereby to a major degree brought about the present fiscal situation which the records in evidence show exists in the District. These conclusions are more than justified by the Benedict testimony and report and by the evidence of the witness Momberg. In our opinion there can be little doubt that under the record, if the loan from the Reconstruction Finance Corporation had not been negotiated, the outstanding bonds of the dissenting bondholders would be worth much less than the price that can now be received by them under the plan that is before us for consideration."

The Benedict report to which the court refers was prepared under the supervision of Dr. Murray R. Benedict, professor of agricultural economics of the University of California staff, and agricultural economist with the Giannini Foundation of Agricultural Economics. It entailed a scientific study of the tax paying ability of the District, and represented about nine months of intensive work. At the trial the witness Momberg, manager of California Lands, Inc., at Merced, a heavy operator in the District, further supplemented and confirmed Dr. Benedict's report and testimony. Dr. Benedict's report covered the years from 1926–1931. Mr. Momberg's testimony covered the years subsequent to 1932 up to and including the year 1938. The testimony of these two witnesses amply support the conclusion that 51.501 cents on the dollar is fair and equitable and all that could reasonably be expected in all the existing circumstances.

The decree of the District Court confirming the plan is affirmed.

DENMAN, Circuit Judge (concurring).

I prefer to confine my concurrence on the question of res judicata and jurisdiction to the controlling effect of the decision in Blair v. Commissioner, 300 U.S. 5, 9, 57 S.Ct. 330, 81 L.Ed. 465. In that case it appears there had been a previous case between Blair and the Commissioner, finally decided in the United States Circuit Court of Appeals for the 7th Circuit, 83 F. 2d 655, in which a tax had been imposed on Blair on the construction of a clause of a testamentary trust, made and enforceable in Illinois, holding it a "spendthrift" trust.

Thereafter there was created what the Supreme Court describes as "a new situation." This consisted of a decision in a proceeding in an Illinois court in which the pertinent trust clause was held not to be a "spendthrift" trust.

In a second suit between Blair and the Commissioner involving the same question of taxation, this intervening new situation was held so to change the question of law involved that the first decision was not res judicata of the second suit. The Supreme Court held: "It is not necessary to review the respective contentions upon this point, as we think that the ruling in the Tait Case is not applicable. That ruling and the reasoning which underlies it apply where in the subsequent proceeding, although relating to a different tax year, the questions presented upon the facts and the law are essentially the same. Tait v. Western Maryland Ry. Co., supra, 289 U.S. 620, at pages 624, 626, 53 S.Ct. 706, 707, 708, 77 L.Ed. 1405. Here, after the decision in the first proceeding, the opinion and decree of the state court created a new situation. The determination of petitioner's liability for the year 1923 had been rested entirely upon the local law. Commissioner v. Blair [7 Cir.] 60 F.2d 340, 342, 344. The supervening decision of the state court interpreting that law in direct relation to this trust cannot justly be ignored in the present proceeding so far as it is found that the local law is determinative of any material point in controversy. Compare Freuler v. Helvering, 291 U.S. 35, 54 S.Ct. 308, 78 L.Ed. 634; Hubbell v. Helvering [8 Cir.] 70 F.(2d) 668." (300 U.S. 5, 9, 57 S.Ct. 330, 331, 81 L.Ed. 465).

In this bankruptcy proceeding we may assume that the statute, held unconstitutional in the Ashton case, is identical with that subsequently enacted upon which this proceeding rests, just as the same trust was construed in both suits between Blair and the Commissioner. However two new situations have been created since the prior proceeding under the first statute involving the same district and dissentient bonds there and a final decision that it was un-

constitutional. These new situations are (a) the enactment of the second statute and (b) a decision of the United States Supreme Court that it is constitutional.

Just as the Illinois court was the appropriate tribunal to determine the character of the Illinois trust, so here the United States Supreme Court is the appropriate tribunal to determine the constitutionality of the second bankruptcy act on which this proceeding rests. It is the "new situation" of the Supreme Court in the Bekins case which makes the decision of this court in the first proceeding involving the same District and the same bonds, not res judicata of the District's present contentions regarding the rights of the same bonds and their holders.

The case of Tait v. Western Maryland Railway Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405, strongly relied on by appellants, differs from the case at bar in the absence of such an intervening decision on the statute as the decision in the Bekins case.

Even assuming the identity of the two acts, and that the decision in Blair v. Commissioner is not applicable, it is of controlling significance that they are bankruptcy acts. As stated by the Supreme Court in the Ashton case, 298 U.S. page 530, 56 S.Ct. 892, 80 L.Ed. 1309, it is peculiarly the character of the bankruptcy power, delegated by the constitution to the congress, that it is intended to alter the contract rights of the bankrupt's creditors. This power as much applies to contract right not to be subject to a municipal bankruptcy proceeding declared by the court's decision on the bonds, as to any other rights of their ownership by the bondholders. It is my opinion that because the second act is a bankruptcy proceeding, so held valid by the Supreme Court, it may take from the bondholders the right adjudicated respecting the bonds in the first proceeding.

With regard to the right of the Reconstruction Finance Corporation to consent for the bonds held by them under the refinancing contract with the District I rest my concurrence on the provision of the instant statute that: "Any agency of the United States holding securities acquired pursuant to contract with any petitioner under this chapter shall be deemed a creditor in the amount of the full face value thereof." 11 U.S.C.A. § 402.

The Reconstruction Finance Corporation is holding the bonds "pursuant to a contract with" the petitioning District. It is a matter of indifference whether the contract is for a pledge of the bonds or a contract giving the Reconstruction Finance Corporation the right to treat the bonds either as a pledge or as subject to acquisition by purchase. It is the sort of contract likely to arise in such a refinancing transaction and what Congress must have had in mind in enacting the provision.

In other respects I concur in the majority opinion.