### No. 2764.

Circuit Court of Appeals, Tenth Circuit.

June 9, 1943.

## WELLS FARGO BANK & UNION TRUST CO. v. IMPERIAL IRR. DIST. et al.

### No. 9988.

Circuit Court of Appeals, Ninth Circuit.

April 28, 1943.

Rehearing Denied June 7, 1943.

Before PHILLIPS, HUXMAN, and WILLIAMS, Circuit Judges.

542

Clark, Nichols & Morton and George Clark, all of Berkeley, Cal., Call, Murphey & Davis and Robert B. Murphey, all of Los Angeles, Cal., and W. Coburn Cook, of Turlock, Cal., for appellants.

Harry W. Horton, of El Centro, Cal. (George R. Kirk, of El Centro, Cal., of counsel), for appellee Imperial Irr. Dist.

George Herrington, of San Francisco, Cal. (Orrick, Dahlquist, Neff & Herrington, of San Francisco, Cal., of counsel), for appellee Imperial Irr. Dist. Bondholders.

Before WILBUR, DENMAN, and HEALY, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal by certain bondholders from a decree of the District Court approving a plan for composition of indebtedness of the appellee District under Chapter 9 of the Bankruptcy Act, 11 U.S.C.A. §§ 401–404.

Appellee is a local taxing agency organized in 1911 under the California Irrigation District Act of 1897, Stats.1897, p. 254, as amended, Deering's Gen.Laws, Act 3854. As authorized by that act it issued four issues of bonds, as follows:

First issue, January 1, 1915, $3,500,000 bearing 5% interest and maturing serially from 1936 to 1955.

Second issue, July 1, 1917, $2,500,000 bearing 5% interest and maturing serially from 1938 to 1957.

Third issue, October 1, 1919, $2,500,000 bearing 5½% interest and maturing serially from 1925 to 1934.

Fourth issue, July 1, 1922, $7,500,000 bearing 6% interest and maturing serially from 1935 to 1956.

Interest on all four issues was payable semi-annually on January and July first.

Beginning in 1924, the District was without cash to meet its current operating expenses and issued warrants for that purpose. Funds being unavailable for payment of these warrants, they were registered on presentation. On December 16, 1932, registered warrants outstanding totaled $884,713.89. All payments of interest and principal on bonds, however, were met promptly until July 1, 1932, when the District defaulted. At that time $750,000 of the third issue bonds and all of the other issues remained outstanding. The District's financial difficulties were due in part to the general economic depression which began in 1929 and, in part, to circumstances peculiar to the District and of earlier origin.

After the default in 1932, a Bondholders' Committee was formed which cooperated with the officials of the District in working out a plan for composition of its bonded debt. This plan, known as the plan of 1932, was approved by the directors of the District on December 29, 1932. Under this plan old bonds were to be exchanged for refunding bonds of equal face value but later maturities, and interest payments coming due before 1937 were to be reduced. Old bonds were to be delivered to the Committee, which would declare the plan

operative when, in its opinion, enough bonds had been deposited to make that desirable. In June 1934, a similar plan for composition of warrant indebtedness was proposed by the District. Both plans were approved by the California Districts Securities Commission[1] and by the voters within the District. By September 1934, approximately 90% of the creditors had accepted the plans, and the Committee declared them to be operative.

In May 1934, Congress enacted the original Chapter 9 of the Bankruptcy Act, 11 U.S.C.A. §§ 301–303, and in September following the District filed in the United States District Court its petition thereunder for approval of the combined plans. The District Court approved the plans. Pending an appeal to this court by some nonconsenting bondholders, the Supreme Court held Chapter 9 to be unconstitutional. Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309. The order of the District Court was accordingly reversed and the District Court instructed to dismiss the petition (Southern Sierras Power Co. v. Imperial Irrigation District, 9 Cir., 85 F.2d 1019), which it did in February 1937, after rehearing by this court was denied. 9 Cir., 87 F.2d 355.

Shortly thereafter various bondholders who had resisted the 1932 plan began actions in the state court to compel such money as was in the District's bond fund to be applied to their claims and to forbid its application to claims of holders of refunding bonds issued under the 1932 plan.

In August 1937 Congress enacted Chapter 10 of the Bankruptcy Act, 50 Stat. 654, now renumbered Chapter 9, 11 U.S.C.A. §§ 401–404, held valid in United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137, and in April 1939 the District filed its present petition thereunder. Through June 1936, interest was paid on refunding bonds but not on original bonds. Interest falling due on all bonds on January 1, 1937, was paid. No interest was paid on any bonds thereafter.

Because of the asserted inability of the District to comply with the plan of 1932, the petition herein presented a modification thereof called the plan of 1939. This plan made further reductions in interest and postponed maturities of some refunding bonds. It also set a limit on bond assessments and provided for further modification of the plan by consent of the District, the California Districts Securities Commission, and 75% of the creditors affected by the modification. The plan of 1939 was approved by the California Districts Securities Commission and by most or all of the holders of refunding bonds, but by relatively few of the holders of original bonds. The District Court approved the plan and enjoined further prosecution of the state court actions above referred to, except to permit the entry of findings, conclusions and judgments and filing of notices of appeal therein. Judgments were accordingly entered in the state court in favor of the plaintiff bondholders, and appeals by the District have been noticed therein. Many objections to the plan are raised by this appeal.

Certain appellants, in a separate brief, claiming priority for bonds issued prior to July 27, 1917 over later issues involved in the reorganization, state their points as follows:

"The plan of 1939 is discriminatory, unfair and inequitable as to holders of bonds of the district of the first issue, dated January 1, 1915, and also as to holders of bonds of the district of the second issue dated July 1, 1917, in this: The said plan treats such bonds as being on a parity as regards security and right to payment with bonds of said district of the third and fourth issues and also as being on a parity as regards security and right to payment with refunding bonds of said district. Under the California Irrigation District Act as it stood when said first two bond issues were issued, it was provided that an irrigation district could issue more than one bond issue, but that the issues must be numbered in the order of the issues, and under Section 40 of said law it was provided that the lien for bonds of any issue should be a preferred lien to that of any subsequent issue. The law conferred on the bonds of a given issue a priority of right to payment over bonds of subsequent issues. The plan of 1939 disregards these superior rights. So does the plan of 1932, and it was and it is invalid for the same reasons."

---

[1] The California Districts Securities Commission Act, Stats.1931, p. 2263, as amended, Deering's Gen.Laws, Act 3857a, established this commission and gave it power to supervise the issuance of securities by irrigation, reclamation, drainage and water districts within the state.

544

They state the question also in the following fashion:

"Are bonds which were issued by a California Irrigation District prior to July 27, 1917 preferred as to right of payment over bonds of subsequent issues?"

At the time the bonds referred to were issued, that is, on January 1, 1915 and July 1, 1917, the Irrigation District Act of 1897, then in effect, contained the following provision:

"Sec. 40. The assessment upon real property is a lien against the property assessed from and after the first Monday in March for any year, *and the lien for the bonds of any issue shall be a preferred lien to that for any subsequent issue, and such lien is not removed until the assessments are paid, or the property sold for the payment thereof.*" § 40, Cal.Stats.1897, p. 267. (Italics ours.)

By reason of this provision of the statute italicised above in regard to priority of liens, which was repealed July 27, 1917, St. 1917, p. 768, it is claimed that the holders of the first and second issue of bonds of the district, which were issued prior to July 27, 1917, are entitled to preferential treatment in the payment of bonds over those issued subsequent to the repeal and that the plan which ignores this preferential right is unfair. The question is not without difficulty and has not been expressly determined by any decision of the California courts.

If the first and second bond issues as a whole were entitled to preference over any subsequent issue the contention of these appellants would have some validity, but the statute does not provide for a prior lien for the entire bond issue and interest, nor spread the lien over the entire area. The statute does not make the bonds issued a preferred lien on all the real estate in the District but makes the assessment levied on each piece of real estate to pay bonds and interest to mature in the following year a preferred lien to that levied on that property to pay matured principal and interest on subsequent issues. It is the lien of the annual assessment which is mentioned in § 40, supra, which is given priority. It is this distinction between the lien for an annual assessment and the lien for the entire bond issue which gives rise to confusion in dealing with the rights of the bondholders, although at first blush there would seem to be no difficulty.[2]

In determining the effect of the former provision of § 40 concerning priority with reference to the scheme for the payment of bonds from moneys derived from the assessments, it should be observed that the statute does not provide for separate assessment for each separate issue of bonds but that the annual assessment under the statute must be spread over all the lands of the district in amount sufficient to pay all matured interest and bonds. Deering's Act 3854, supra, § 39; Selby v. Oakdale Irr. Dist., 140 Cal.App. 171, 35 P.2d 125.

The statute neither provides for nor authorizes a payment of any portion of the assessment by the taxpayer but requires that the whole be paid by him or, in default thereof, that the land be sold to the district for the whole amount of the assessment. It cannot be sold for less. Deering's Act, 3854, supra, §§ 43, 45.

If the land is sold and purchased by the district the certificate of purchase may either be sold by the district for the amount of the assessment (Deering's Act 3854, § 45, supra) or retained by it until the redemption period of three years expires. Deering's Act 3854, § 47. If the certificate is sold to third parties for the amount of delinquent assessments, penalties and costs, as § 45, supra, permits, the moneys so derived are payable to the holders of bonds for which the assessment was made in accordance with their rights, (Provident Land Corp. v. Zumwalt, 12 Cal.2d 365, 85 P.2d 116), but even then there would be no occasion to give priority because always the amount realized must be sufficient to cover the entire assessment for all amounts matured on all the bonds. Deering's Act 3854, § 45 supra. On the other hand, if the district does not sell the certificate of sale as provided by the statute but retains the same during the three-year redemption period, it becomes entitled at the end of that period to a deed of the fee simple title to the land. Deering's Act 3854, § 47, supra. The rights of the bondholders

2 Compare the statement by the California Supreme Court in its original opinion in Dougery v. Bettencourt, 2 P. 2d 765, 766; "The [Irrigation District] bond issue is a general obligation upon all lands in the district, but a lien upon a specific piece of property arises only after an assessment has been levied." In the opinion on rehearing, 214 Cal. 455, 6 P.2d 499, discussion of this point was omitted. Cf., Boskowitz v. Thompson, 144 Cal. 724, 730, 78 P. 290.

in either event are similar. That is to say, if the certificate is sold to third persons the money must be distributed to or for bondholders in accordance with amounts matured, whereas if the land is purchased by and deeded to the district the equitable interest of the parties in the proceeds thereof is in proportion to the amount of the assessment levied to pay their bonds. Hence, there would be no occasion for preference. The statute implies that the sale for taxes satisfies the lien of the assessment to pay bonds (Deering's Act 3854, § 40, supra) and that statute does not provide for any priority in the receipts from the sale.

It has been held by the California Supreme Court that the bondholders have no direct interest in the real estate thus acquired and no right to compel its partition or division between the bondholders. Clough v. Compton-Delevan Irr. Dist., 12 Cal.2d 385, 85 P.2d 126. It has also been held that the moneys derived from these lands by the district from leasing or selling the land must go into the bond fund. Provident Land Corp. v. Zumwalt, 12 Cal. 2d 365, 85 P.2d 116, supra.

The question of priority has been considered by the Supreme Court of Colorado with reference to an irrigation district act substantially the same as that in California embodying the same provisions with reference to preferential assessment liens. The court there held that where the assessment was made to service all outstanding bond issues, there was no method by which preference could be given to the holders of the first issues of bonds entitled to prior assessment liens and that in default of such provision the money must be prorated among all bond issues. Thomas v. Patterson, 61 Colo. 547, 159 P. 34. We do not cite this decision as authoritative because the statutes and decisions of California control here but it indicates the difficulties involved in providing for priority of irrigation district bonds first issues when a single assessment is made for all issues.

■ The Supreme Court of the state of Washington in considering the effect of preferential treatment of bonds first issued under an irrigation district act similar in terms to that of California, held that from the $13,000 in the bond fund the bonds first issued should be first paid, and thus give a preference provided in the statute. State ex rel. Benton County Columbia Co. v. Forsyth, 170 Wash. 71, 15 P.2d 268. It is unnecessary, however, for us to hold that there is no preference or priority in the administration of this fund or to what extent there is a preference, if any, because in any event preference and priority would be applied only to the annual assessment for which the land was sold to the district and no basis has been provided in the record for giving such preference. That is, it is not shown that as to any particular tract, money has been received to satisfy part but not all of any particular annual assessment.

■ On this subject of priority of earlier bond issues the appellants advancing the claim call particular attention to their claims in and to 114,874 acres of land appraised for taxation at $3,162,960, which has been purchased by and deeded to the District for delinquent taxes assessed and levied for maintenance and for bonded debt service. They say: "It is inconceivable that if assessments for particular bonds have priority and the land assessed to pay such bonds and other bonds is sold to the District for default in meeting taxes that land ceases to be security. It is security, and it is security for the bonds of the District in the order in which the statute makes the assessments for bonds, liens on the lands." The statute relied on does not so provide, neither has any California court so decided. We need not anticipate such decision by hypothetical assumption of facts. It is sufficient to say that the trial court found the plan of reorganization to be fair, without subjecting such lands to special treatment and we cannot say that the trial court erred in so holding.

The same appellants contend that their bonds of the first and second issues must be put in a separate and preferred class because improvements on land, as well as the land itself, are liable to assessment for their payment. Until after July 1, 1917, § 33 of the Irrigation District Act, Deering's Act 3854, supra, provided that "all the real property" in the District was liable to bond assessments. St.1897, p. 265. In 1917, St.1917, p. 764, the section was amended to substitute "land" for "real property". Thus, so far as § 33 is concerned, improvements were assessable for bonds of the first and second issues which preceded the amendment. The real difficulty with the contention of these appellants lies in § 35, which formerly expressly provided for assessment of improvements as well as land. In 1909, St.1909, p. 461, before the appellee district was formed, § 35 was amended to exempt improvements, with the

following proviso: "provided that the provisions of this section relating to the exemption of improvements on any lands or town lots situated within the district shall be exempt from taxation, shall not apply in any district now organized unless said provision shall be approved by a vote of a majority of the resident holders of title to lands situated within the district and subject to taxation therein at a special election called for the purpose of making said provision herein applicable."

These appellants contend that this proviso is a "local or special" law, within the prohibition of Art. IV, § 25 of the California Constitution, a grant of special privileges to a class of citizens, prohibited by Art. I, § 21, and a law of a general nature, not uniform in its operation, as required by Art. I, § 11, either as between existing districts and those subsequently organized, or as among existing districts. As among existing districts the provision was not made invalid by the fact that its application to any particular district depended upon its acceptance by such district. The opportunity to accept was available to all alike. Compare, Scott v. Boyle, 164 Cal. 321, 326, 128 P. 941, and Livingston v. Robinson, 10 Cal.2d 730, 76 P.2d 1192. The distinction for the purpose of the section between existing districts and those subsequently organized must be presumed to be a reasonable one, and so not violative of the constitutional provisions relied on. Appellants have not sustained their burden of showing the contrary. Livingston v. Robinson, 10 Cal.2d 730, 76 P.2d 1192, supra. The classification, being reasonable, is not an unconstitutional grant of privileges to a special class. Pacific Coast Dairy v. Police Court, 214 Cal. 668, 8 P.2d 140, 80 A.L.R. 1217.

Appellants' final objection to the 1909 amendment is that it unconstitutionally impaired the obligations of bonds previously issued. No reason appears why the application of this amendment to prior issues is not separable from its application to subsequent issues. It follows that appellants, whose bonds were issued after the amendment, are not in a position to urge its invalidity, if any, in this regard. We conclude that appellants have no right to an assessment of improvements on land for payment of their bonds.

Preference resulting from prior presentation:

Appellants next argue that under § 52 of the California Irrigation District Act (Deering's Act 3854, supra) matured bonds and coupons first presented for payment have a priority over those later presented, which priority should be recognized.

Section 52 of the California Irrigation District Act provides that coupons and bonds shall be paid on presentation, but that if no funds are available therefor, coupons and bonds shall be stamped on presentation and draw seven percent interest until notice is given that funds are available for their payment and provision shall be made for their payment as in the case of warrants. This provision and § 61a providing procedure for payment of warrants have been held by the California courts to entitle bondholders to be paid in order of presentation as funds become available. Bates v. McHenry, 123 Cal.App. 81, 10 P.2d 1038; Shouse v. Quinley, 3 Cal.2d 357, 45 P.2d 701. These cases clearly hold that this right of bondholders to be paid in order of presentation is a vested right with which the legislature cannot interfere. They likewise hold that at least as long as the District continues to have a theoretically inexhaustible power to replenish by assessment its bond fund, it is not required or permitted to make pro rata payments, but must pay bonds and coupons in full as presented, until available funds are exhausted. However, in Clough v. Baber, 38 Cal.App.2d 50, 100 P.2d 519, the California District Court of Appeal for the Third District, stated an exception or limitation to this rule. The question before us is whether this limitation is applicable to the present case and if so whether the limitation must be recognized as the law of California, or disregarded as conflicting with the holdings of cases previously decided by the Supreme Court of the state. In Clough v. Baber, supra, it was held that when the district had not sufficient funds to pay its bonds, and all the lands in the district had been sold to the state for delinquent assessments, so that no further levies could be made by the district, then payments should be prorated rather than paying bonds in full as presented until the funds were exhausted. A similar rule has been applied by the Supreme Court of California in Kerr Glass Mfg. Corp. v. City of San Buenaventura, 7 Cal.2d 701, 62 P.2d 583.

Appellants seek to distinguish the present case from Clough v. Baber on the ground that here only a relatively small part of

the land in the district has been sold for delinquent assessments. We do not consider this material. The fundamental point in Clough v. Baber was that there would be no more funds available for bond purposes. The same is true in the case at bar, not because of sale of land to the state but because of the composition proceeding. This composition proceeding will limit the total amount that will be available for payment of bonds at least as effectively as sales to the state limited such amount in Clough v. Baber. The rule of that case must consequently be equally applicable here and requires payments to be prorated among all bonds rather than payments made in full in order of presentation until the fund is exhausted. The basis of the procedure for which appellants contend is that there will apparently be in the end enough funds to pay all in full. That is not the case here. This agrees with the conclusion heretofore reached by this court in West Coast Life Ins. Co. v. Merced Irr. Dist., 9 Cir., 114 F.2d 654, 672; Moody v. James Irr. Dist., 9 Cir., 114 F.2d 685, 688; and, Taylor v. Provident Irr. Dist., 9 Cir., 123 F.2d 965, 967. Appellants are right in saying that the question, being one of local statutory interpretation, must be decided in accordance with the decisions of the state courts, but we believe that our former decisions correctly stated the California law and we adhere to them in the absence of any convincing showing to the contrary.

Validity of consents by bondholders who had previously consented to the plan of 1932 and accepted new bonds thereunder:

▪ Appellants next argue that bondholders who had accepted refunding bonds under the uncompleted plan of 1932 were holders of bonds of a different class from those held by appellants, who continue to hold their original bonds, and that accordingly consents by such bondholders cannot be counted in determining whether holders of two-thirds of the class of bonds held by appellants have consented to the plan as required by 11 U.S.C.A. § 403, sub. d.

Section 83, sub. j of the Bankruptcy Act, 11 U.S.C.A. § 403, sub. j, provides: "The partial completion or execution of any plan of composition as outlined in any petition filed under the terms of this title by the exchange of new evidences of indebtedness under the plan for evidences of indebtedness covered by the plan, whether such partial completion or execution of such plan of composition occurred before or after the filing of said petition, shall not be construed as limiting or prohibiting the effect of this title, and the written consent of the holders of any securities outstanding as the result of any such partial completion or execution of any plan of composition shall be included as consenting creditors to such plan of composition in determining the percentage of securities affected by such plan of composition."

Appellants concede that under this provision, the acceptance of refunding bonds under *the plan before the court* does not change the status, for the purpose of computing consents, of creditors so accepting. Appellants argue, however, that the plan before the court is the plan of 1939 and not the plan of 1932 and that although creditors consenting to the plan of 1939 are deemed, under § 403, sub. j, to be of the same class as they were before consenting thereto, their previous acceptance of refunding bonds under the plan of 1932 put them in a different class from appellants who hold their original bonds and have never consented to either plan. That is to say, appellants argue that § 403, sub. j does not permit us to disregard the effect of acceptance of any plan except the precise plan before the court.

A somewhat similar question was considered by this court in West Coast Life Ins. Co. v. Merced Irr. Dist., 9 Cir., 114 F.2d 654, supra. The question there under consideration was whether § 403, sub. j applied to a case where the prior consent to the plan had not yet been given effect by the issuance of refunding bonds and to what extent such consenting creditors were to be deemed creditors in computing consents to the plan. The court there said: "Congress intended by this enactment to provide that partial completion of a plan of composition, even in a situation where refunding bonds have already been issued, shall not be construed as changing the status of the parties." 114 F.2d 654, 668.

The court held that, *a fortiori*, the section required it to consider as unchanged the status of bondholders who had consented to the plan of composition but had not yet received new securities under it.

In Ouerbacker v. Henderson County, 4 Cir., 126 F.2d 309, it was held that consents by holders of refunding bonds who had agreed to both a first and second plan (of which the first was uncompleted and the second, also uncompleted, was before the

court) were to be counted on the basis of their original claims, unmodified by either consent. However, the precise objection to this procedure which is now made by appellants was not discussed in the court's opinion and was presumably not presented to the court.

No other pertinent cases have been brought to our attention. Assisted by such light as the foregoing authorities may shed upon our problem we turn to an examination of § 403, sub. j, supra. That section provides, "written consent of the holders of any securities outstanding as the result of any such partial completion or execution of *any* plan of composition shall be included as consenting creditors to *such* plan * * *". (Italics ours.) Appellants assume that "such" refers back to "any", that is, to the plan under which the refunding bonds are held in this case. The section as a whole makes it more reasonable to believe that "such" refers back much further, to the opening phrase, "any plan of composition as outlined in any petition", etc. The section uses the term "such plan" in *that sense at one point*, before the phrase "any plan" to which appellants refer. The phrase "any plan" must have been used deliberately to cover a broader field. The question then arises, is the subsequent use of "such plan" meant to refer to "any plan" partially completed, or to the plan before the court previously referred to as "such plan" in the section.

The latter appears necessarily to be the correct construction; otherwise the broader scope of the term "any plan" is nullified by restricting it in its effect to a plan concerning which consents are to be computed, which is necessarily the plan before the court. We would paraphrase the section thus:

"The partial completion of any plan as outlined in the petition, whether partial completion of such plan as outlined in the petition was before or after filing, shall not limit the effect of this title, and holders of securities under any partial completion of any plan may be included as consenting creditors to such plan as is outlined in the petition."

So construed, the section does not support appellants' contention that the only change in a creditor's status which will be disregarded is one resulting from his consent to the very plan before the court.

In West Coast Life Ins. Co. v. Merced Irr. Dist., 9 Cir., 114 F.2d 654, 668, supra,

the opinion quotes from the Congressional Record, showing that the purpose of § 403, sub. j was to avoid the holding in Re City of West Palm Beach, 5 Cir., 96 F.2d 85, that a creditor who has irrevocably consented to a plan has put himself into a different class from non-consenting creditors, so that his consent may not afterward be counted, in proceedings under the act, in determining the percentage of consents in the non-consenting creditors' class. Appellants' construction of the section would conflict with this purpose.

In any event, the so-called plan of 1939 now before the court is nothing more than a modification of the plan of 1932. Even if we were to accept appellants' construction of § 403, sub. j we could not agree that the plan of 1932 was a different plan so as to deprive bondholders who accepted refunding bonds under it of the benefits of § 403, sub. j in the present proceeding.

Moreover, the rule of the West Palm Beach case would not necessarily be determinative here, even in the absence of § 403, sub. j, since it rested on the fact that acceptances of the refunding plan were irrevocable. In the case at bar the agreement under which the refunding plan of 1932 was adopted expressly provided that "The [Bondholders'] Committee, at any time prior to carrying out the plan or any modified or substituted plan or readjustment or liquidation of the indebtedness of said District, may abandon the plan or such modified or substituted plan if in its discretion it may be deemed advisable so to do, notwithstanding that the same has been declared or has become operative. * * *"

For all the foregoing reasons we hold that consents of holders of refunding bonds under the plan of 1932 were properly counted in the same class with appellants'.

The plan presented to and approved by the court contained a provision for its future modification to which the appellants object. They state their point as follows:

"Point on Appeal No. 3:

"Paragraph XIII of the plan of 1939 and Section 11 of the resolution of the Board of Directors of the District, which is a part of said plan, provide that said plan may be modified as to the bonds merely through a resolution of the Board of Directors of the district, approved at an election and with the consent of the bondholders holding 75% of the principal amount of bonds affected by the proposed change, and if the change affects the warrants the consent of warrant

holders holding 75% of the principal amount of the warrants affected by the change shall be given, and that the plan may be changed as to the bonds without change as to the warrants.

"The provisions of the plan of 1939 referred to are designated in this statement as the 75% modification clause. The 75% modification clause is invalid, and is also not fair and equitable for the following reasons:

"(a) Congress had no power to enact a bankruptcy law that permitted the adoption of a plan containing the 75% modification clause. Such authority is beyond the provisions of Art. I, Sec. 8, subdiv. 4 of the Constitution.

"(b) The modification clause is not authorized by Section 83. On the contrary, it is contrary thereto. Section 83 requires that the Court shall not confirm a plan unless it determines that the plan is, under the evidence, one that can be carried out.

"(c) The 75% modification clause fixes no standard by which it is to be determined whether a proposed change or modification shall be made, or by which the extent or character thereof shall be determined.

"(d) The 75% modification clause purports to authorize and make binding on all creditors of the district affected by the plan of 1939 any modification of or substitute for the plan of 1939, without the necessity of the approval of the bankruptcy court (United States District Court) or any determination or finding by the court with respect thereto that the same is nondiscriminatory, fair and equitable and for the best interests of such creditors, or making any of the other findings or determinations required by Section 83.

"(e) The 75% modification clause purports to authorize and make binding on all creditors of the district affected by the plan of 1939 any modification or substitute for the plan of 1939 after Section 83 has expired by limitation of time and without any enabling act authorizing or regulating such modification or substitute.

"(f) The 75% modification clause is an illegal delegation of authority to create or put into effect a plan of composition not approved by the court in which this proceeding was instituted or destroy the plan of 1939 as it would be when first put into effect.

"(g) The 75% modification clause accords no opportunity to appellants or to any dissenting bondholder to be heard as to the necessity or reasonableness of any proposed change or modification of the plan, or with respect to any of the other features which a plan of composition must contain in order to conform to Section 83, and provides for impairing the rights of appellants or any dissenting bondholders without compensation and without due process of law, and in violation of the Fifth Amendment of the Constitution of the United States.

"(h) The 75% modification clause provides for, or permits, discrimination.

"I. It is provided that the obligations of the bonds may be impaired without affecting the warrants, yet the two kinds of obligations are of the same class, and the plan of 1939 so treats them.

"II. The said provisions permit impairing the obligations of the undischarged bonds although bonds of prior maturities may have been fully paid.

"Nothing in said clause requires that unpaid bonds shall be eventually fully paid or paid to the extent of payment previously made pursuant to the plan on bonds that may have already matured.

"(i) The 75% modification clause is not authorized by state law. Sections 32a and 32f of the California Irrigation District Act do not provide that such a modification clause is valid unless there be unanimous agreement amongst the bondholders to inserting this provision in the bond. Furthermore, said sections do not refer to original bonds, but only to refunding bonds. The decree appealed from imposing the 75% modification clause on appellants without their consent is not the equivalent of the consent or agreement by appellants to the 75% modification clause."

The statutory provisions invoked by appellants are contained in 11 U.S.C.A. § 403, sub. e, and the two clauses most particularly relied upon are the ones requiring the court to find, first, that the plan is fair, equitable and for the best interests of the creditors and does not discriminate unfairly in favor of any creditor or class of creditors, and, second, that it "complies with the provisions of this chapter."

■ In considering the contention of the appellants it should be remembered that the plan of composition is one agreed upon by the District and a majority of the creditors affected and that the function of the court is to determine whether or not the agreement made complies with the statutory requirements. It should be re-

membered also that by the terms of the statute under which this reorganization took place, the court had no jurisdiction as to petitions filed after June 30, 1940, subsequently extended to June 30, 1946, 11 U.S.C.A. § 404, 50 Stat. 659, 54 Stat. 670, 56 Stat. 377, while the agreement contained in the plan was effective during the life of the bonds, the last of which matured in 1983, so, as the law stood at the time the matter was presented to the court for confirmation, the agreement would be effective for 37 years after the right to file a petition under the act had expired.

The question presented is whether or not the parties could make an agreement in the plan for composition to be approved by the court, for the modification of the plan by less than all of the parties thereto after the power of the court to entertain a petition for further relief had terminated under the statute.

The plan for modification provided not only for the consent of 75% of the creditors affected by the modification but also required approval by the District, manifested by an election in which a majority of the voters express their approval, and by the California Districts Securities Commission, which under the laws of the state is authorized to consider and approve such a modification. California Irrigation District Act (Deering's Supp.1939, Act 3854) § 32f, Stats.1939, c. 13. It is true that the bankruptcy act by its provisions does not expressly provide for such a clause in the plan of composition but this is not decisive for the statute does not undertake to enumerate all the permissible terms of any plan (11 U.S.C.A. § 403, sub. a), but only that as a whole it shall have certain characteristics provided in 11 U.S.C.A. § 403, sub. e. A condition is not inconsistent with the provisions of the bankruptcy act merely because it contains a method of modifying the plan which is not contained in or provided for in the chapter. If a new plan of composition should be proposed by the creditors approved by the District and the Districts Securities Commission it might be that the creditors objecting to a new plan would be entirely different from those who objected to the original plan. In other words, the small percentage of bondholders who are now objecting to the plan and who have appealed to this court, or their successors, might be the very ones who desired the modification. It was stated by the attorneys for the District, on argument, that without this proposed provision for modification of the plan the consent of the bondholders and creditors who agreed thereto could not have been obtained nor would they agree to a modification of the plan which would eliminate this provision. In other words, the 99½% of the bondholders who have agreed to this composition do not wish to place themselves in a position where a small percentage of the bondholders can frustrate any plan for solving all the difficulties which the District and the bondholders may encounter in the future. It may be said that they should be willing to rely upon the power of Congress to extend the provisions of the present act or if an emergency occurs to enact a new statute. It is sufficient answer to this suggestion to say that the proposed plan is satisfactory to the 80% (now 99½%) of the bondholders and warrant holders who have agreed to the plan. It is true that this agreement provides for the taking of action on consent of only 75% of the bondholders and to that extent the claims and rights of the remaining twenty-five per cent may be frustrated but this frustration relates back to the statute under which the proceeding is taken and to the approval of the present plan.[3] The government of the United States, through its bankruptcy act, has undertaken to resolve an otherwise unsolvable situation and it is only because of that power vested in the federal government that this composition can proceed at all against the wishes of any bondholder. Although it is true that the statute makes no provision for such a modification clause we cannot see that it is inconsistent with the terms of the statute. On the contrary, it seems to be in furtherance of the object of the whole statute. After all, the composition plan when approved by the court, is the plan of the District and the creditors in which the nonconsenting bondholders have been coerced by governmental power. The difficult question as to whether or not the government has such power has been resolved by the Supreme Court and by Congress. We see no occasion for frittering away that power by analyzing the details of a complicated plan and holding that some of the details are inconsistent with the statute because not expressly provided for therein.

---

[3] Cf. Getz v. Nevada Irrigation District, 9 Cir., 112 F.2d 495.

██ Uncertainty as to basis of exchange of bonds:

Appellants' next contention is that the plan of composition is too uncertain to be operable in that it does not specify what refunding bond is to be given for any particular original bond.

The outstanding original bonds were of varying interest rates and serial maturities, as follows:

1st issue (1915) 5% maturing 1936–1955
2nd " (1917) 5% " 1938–1957
3rd " (1919) 5½% " 1933–1934
4th " (1922) 6% " 1935–1956

The refunding bonds are sinking fund bonds, with interest and maturities under the plans of 1932 and 1939, respectively, as follows:

| | 1932 | 1939 |
|---|---|---|
| 1st division 5% | 1983 | 3¾% 1983 |
| 2nd " 5½% | 1939 ($350,000) | |
| | | 4⅛% 1964 |
| | 1942 ($400,000) | |
| 3rd " 6% | 1983 | 4½% 1983 |

The plan establishes a separate sinking fund for each division of refunding bonds and schedules the annual payments to be made into each fund. Not more than $10,-000 is to remain in any sinking fund for longer than one year. The excess is to be invested or devoted to call or purchase of bonds of that division. Call and redemption of bonds is to be in numerical order and, under the 1932 plan, second division bonds maturing in 1939 were to be called and redeemed before those maturing in 1942. Original bonds are exchangeable for refunding bonds, par for par, as follows: 1st and 2nd issue original bonds for 1st division refunding bonds; 3rd issue original bonds for 2nd division refunding bonds; 4th issue original bonds for 3rd division refunding bonds.

The provision of the plan of 1939 for exchange of bonds is as follows:

"In effecting the exchange of deposited bonds for Refunding Bonds, the Committee will, in so far as possible, distribute to each depositor Refunding Bonds numbered in such numerical order as to occupy as nearly as practicable the same relative position with respect to maturity as the maturity of the bonds deposited by the depositor occupies with respect to the maturity of other outstanding bonds, but Refunding Bonds may be distributed in any order in exchange for outstanding bonds maturing on the same date. If such distribution be impracticable, in the uncontrolled discretion of the Committee, the Committee may make such arrangements for the distribution of Refunding Bonds to the depositors as it may deem fair and proper."

The argument is that if the District elects to redeem refunding bonds in advance of maturity, then since redemption if made must be in numerical order, low-numbered bonds will have an advantage, and the plan makes no provision for determining to which bondholders such advantage shall be given.

Appellee cites Ouerbacker v. Henderson County, 4 Cir., 126 F.2d 309, 316. In that case, redemptions if made were to be in numerical order of the refunding bonds, and this numerical order did not correspond to the order of maturities of the original bonds. The court said that although this unquestionably involved a failure to preserve certain advantages of some of the bondholders it did not go to the essence of the plan. We agree with the conclusion that the feature complained of does not render the plan essentially unfair. All the bondholders are of one class. Within a class there is no right of preferential treatment for one over another. Bondholders can only object when the advantages available under the refunding are distributed in an unfair or discriminatory way. The provision for "uncontrolled discretion" in the committee cannot of course be understood as giving it a right to abuse its discretion or to discriminate unfairly among bondholders.

Since a bondholder cannot complain of the result, whatever refunding bond he may receive, we do not see that he can complain of uncertainty in the provisions for determining what bond he shall receive. This answers appellants' objection that the Ouerbacker case is not in point for the reason that the schedule of exchange of new bonds for old appeared in that case to have been included in the plan. We conclude that the uncertainty here discussed is not objectionable.

 Interest on matured and unpaid coupons:

Appellants' next contention is that the plan is unfair because it makes no provision for payment of interest on their coupons which matured and remained unpaid, although coupons on refunding bonds maturing at the same time were paid

promptly. Appellants claim the benefit of § 52 of the California Irrigation District Act, supra, which provides for registration of matured bonds and coupons when funds are not available for their payment and provides for 7% interest thereon until they can be paid in order of registration. In Clough v. Baber, 38 Cal.App.2d 50, 100 P.2d 519, it was held that when an irrigation district is insolvent available funds in the treasury should be prorated among all bondholders without regard to time of registration, notwithstanding the provisions of § 52, supra. This decision was made in rejecting a claim that bonds should be paid in full, in order of registration, until funds ran out, but presumably this was accompanied by a claim for the 7% interest, although that does not appear from the opinion. Interest cannot be allowed from the date of registration of demand for payment under § 52 if available funds are to be distributed pro rata "without regard to the date of registration". Under this decision these provisions of § 52 do not give a right to priority of payment or, we believe, to interest in cases of insolvency where the rights of all creditors must be determined.

In West Coast Life Ins. Co. v. Merced Irrig. Dist., 9 Cir., 114 F.2d 654, 678, cited by the District, the refinancing was by a loan from the Reconstruction Finance Corporation at the rate of 51.501 cents on the dollar. The Reconstruction Finance Corporation was to receive 4% on its loan from October 4, 1935. The district agreed to pay 4% to bondholders who deposited their bonds, from the time of deposit until October 4, 1935, when money was to be received from the R. F. C. to pay them for their bonds at the agreed discount. This was held not to discriminate in favor of depositing bondholders as against non-depositing bondholders. The same offer was made to all bondholders. Also, this was not part of the agreed plan but merely a means adopted for putting the plan into execution. The facts of the present case are not the same. The objection is of less weight in the present case. In the Merced case depositors got 4% interest on their bonds until paid by the R. F. C., while non-depositors got none. In the present case the same interest on principal is paid to all and no interest on coupons is paid to any. The only distinction between depositors and non-depositors is that depositors herein received their coupon payments on the refunding bonds sooner because they deposited their old bonds sooner. Appellants argue that this is unfair since they were under no obligation to deposit their bonds and so should not be discriminated against for not doing so. We do not agree. If the depositing bondholders did something that they did not have to do and which all bondholders could do if they so desired, there is no unfairness in giving them the advantages of a plan which the others rejected.

Appellants' next objection to the plan is that it discriminates unfairly in favor of warrants and Second Division refunding bonds. We have examined appellants' argument in this connection and find nothing in the evidence to justify a reversal of the trial court's finding that the plan is fair in this regard.

Appellants' next point is that in the mandamus proceedings in the state court, previously referred to herein, the California Superior Court for Imperial County had held appellants to be entitled to be paid from the bond fund, that this holding was binding on the District Court and that the District Court erred in finding to the contrary. The fallacy of this contention is that the present composition proceeding introduced a new element into the situation which was not before the state court and which resulted in modifying rights theretofore existing. The state actions did not purport to establish any property rights in the bond funds in favor of appellants. They were merely mandamus proceedings to determine the duty of the District's officers under the circumstances then existing. Issuance of writs of mandamus was suspended, probably for the very reason that new circumstances under this composition proceeding under the recently enacted provision of the Federal Bankruptcy Act were expected to modify the rights of appellants so that they would no longer be entitled to such writs. The very purpose of 11 U.S.C.A. § 403, supra, is to modify the rights of creditors. An adjudication determining what those rights are in the absence of bankruptcy proceedings cannot make them thereafter any more impervious to such federal bankruptcy proceedings than they previously were. Furthermore, appeals are pending from all the judgments referred to. Pending appeal, the judgment of a California Superior Court is not final and is not evidence of the rights therein declared. See, 2 California Jurisprudence 412.

Findings and judgment:

Appellants next raise an objection to the judgment: That the judgment is final in form whereas it should have been interlocutory.

██ We consider first the form of the judgment.

The Bankruptcy Act provides (11 U.S.C.A. § 403, sub. c): "The judge * * * may enter an interlocutory decree providing that the plan shall be temporarily operative * * *", and (11 U.S.C.A. § 403, sub. f): "If an interlocutory decree confirming the plan is entered as provided in subdivision (e) of this section, the plan and said decree of confirmation shall become and be binding upon all creditors affected by the plan, if within the time prescribed in the interlocutory decree, or such additional time as the judge may allow, the money, securities, or other consideration to be delivered to the creditors under the terms of the plan shall have been deposited with the court * * *. And thereupon the court shall enter a final decree * * *."

The present decree is entitled "Interlocutory Decree" and provides: "Said Plan of Composition is hereby made immediately operative with respect to all securities affected thereby. That the petitioner is hereby authorized to and shall forthwith take all steps required herein, and by said Plan of Composition hereby confirmed, to carry the same into effect forthwith, and shall make and file herein its report with respect thereto not later than July 1, 1941 (or within such additional time as the Judge of this Court shall allow) showing the action taken by said Petitioner to carry out said Plan of Composition * * * and this Court hereby reserves and shall have full and complete jurisdiction of said Plan of Composition until the entry of a final decree * * *."

It seems plain that this is in intent and effect exactly the sort of interlocutory decree provided for by the statute. Its only possible defect is its omission of the statutory word "temporarily" in the provision that the plan is made "immediately operative." "Temporarily" is not a word of art. The effect of the decree is only temporary and its nature is determined by that fact. We do not agree that the decree is final in form.

██ The findings are in ninety-six separate numbered paragraphs and there are fourteen conclusions of law. The appellants object to the omission of specific findings on certain points but it is not pointed out how the appellants are prejudiced by such omission. Moreover the general findings contained in the findings of fact and in the conclusions of law sufficiently cover the alleged omissions. For instance, it is found that "it is for the best interests of all parties that said Plan of Composition be approved and confirmed", (Finding XCI) and "that the Plan of Composition herein set forth is fair, equitable and for the best interests of the creditors and does not discriminate unfairly in favor of any creditor or class of creditors." Conclusion of Law II.

Fairness of the plan:

Appellants' final contention is that the plan is unfair. The argument is to some extent merely a reiteration of points already made and considered by us herein.

██ It is objected that the District is not insolvent. However, the act does not require insolvency. 11 U.S.C.A. § 403 begins: "Any petitioner may file a petition hereunder stating that the petitioner is insolvent or unable to meet its debts as they mature * * *". The trial court concluded that the latter was true in the case at bar. This conclusion was amply supported by the findings and evidence.

Appellants point out that the District has been currently collecting more on assessments than its budget calls for. The reason that this has been possible, however, is that its budget has not called for enough to pay its obligations at their original face value.

██ Appellants' objection that the value of tax-deeded land was not included in the District's assets is not wholly answered by the fact pointed out by the District, that profits from sale or leasing of such land are all to go into the bond funds. Whether they go into the bond funds or not the amount to be received by the bondholders is fixed by the plan. The real benefit from such lands will be that the District may be able to lower its assessments or discharge the bond obligations sooner. However, it seems that the profits from such land will not be great. We cannot say that the plan is necessarily unfair for failure to include receipts from them in estimating the amount that the District will be able to pay.

██ As to the omission to include revenues to be derived from the use of the

All American Canal, the testimony was that revenue from water sales in Mexico was speculative. We cannot say that the trial court erred in disregarding it in considering the ability of the District to pay its bonds or in forming the plan of payment approved by the court.

Appellants object also because the plan does not give them the benefit of possible future improvement in the District's financial condition. We agree with the trial court that the absence of such a provision does not make the plan unfair. There is always a possibility that a bankrupt debtor's position will improve, but there is no more reason for giving creditors the benefit of that possibility in this case than in every case of bankruptcy.

We find no merit in the contentions of the appellants.

Judgment affirmed.

DENMAN, Circuit Judge (dissenting).

It is immaterial, so far as concerns the establishing of a dangerous and wrongful precedent, that the contention of the illegality of the plan is raised here by but a small percentage of the creditors.

"The fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard. The former is not a substitute for the latter. They are independent. See Case v. Los Angeles Lumber Products Co., supra, 308 U.S. [106], pages 114-115, 60 S.Ct. [1], 6, 7, 84 L.Ed. 110." American United Mut. Life Ins. Co. v. Avon Park, 311 U.S. 138, 148, 61 S.Ct. 157, 163, 85 L.Ed. 91, 136 A.L.R. 860.

A. What the majority hold is that the debtor district, with 75 percent of the creditors, may be empowered to modify at any time within 37 years a plan affecting 25 percent of the creditors, without the district court retaining the power to determine whether the proposal of the 75 percent is fair and equitable and non-discriminatory to the 25 percent. The district court not only does not purport to retain such power, but it delegates the exercise of a power to make finally binding the modified plan of the debtor district and 75 percent of the creditors, without making any criterion for the modification,[1] much less that it shall be that the modification is fair and equitable to the 25 percent of the creditors and shall not discriminate unfairly between them and other creditors of the same class. 11 U.S.C.A. § 403(e).

To me it seems to make a farce of the provisions for the fair and equitable and non-discriminatory finding by the district court, created under the Constitution as the bankruptcy tribunal, to delegate to the debtor, 75 percent of the bondholders and

---

[1] "Section 11. Amendments: The Plan of 1932 and said Warrant Retirement Plan and this Modification thereof, as set forth in this Resolution, may be amended, modified or altered at any time or from time to time hereafter, whether before or after the date on which this Modification may become operative, in the manner herein provided. The District, by resolution of its board of directors, may propose any such amendment, modification or alteration and shall submit the same to the electors of the District at a special election to be called and held for that purpose. Such election may be called or held as now or may hereafter be approved by law, or, in the absence of any express provision of law, may be called and held in substantially the same manner as provided by law for the holding of an election for the issuance of bonds of the District, except that only a majority vote of the electors need be required and except that the proposition to be submitted at such election shall be whether or not such amendment, modification or alteration shall be adopted. Such amendment, modification or alteration shall be subject to the approval of the California Districts Securi-

ties Commission or its successor in office at the time and (a) if such amendment, modification or alteration of the Plan of 1932 as modified by this Modification, the holders or owners of 75% in principal amount of the refunding bonds then outstanding, or (b) if such amendment, modification or alteration affects the Warrant Retirement Plan as modified by this Modification, the holders or owners of 75% in principal amount of warrants. No consent of the holders of said bonds shall be required to any amendment which affects only the warrants subject to the Warrant Retirement Plan and no consent of the holders of said warrants shall be required to any amendment which affects only the bonds subject to the Plan of 1932. The assent of the holders or owners of such refunding bonds or warrants shall be evidenced in writing in such manner as may be prescribed by the District or as may be required by law. Such amendment, modification or alteration effected in the manner aforesaid shall be binding upon the holders and owners of all of the then issued and outstanding securities affected thereby."

two state political bodies[2]—the bondholders in election meeting and the California Districts Securities Commission—the power to modify the plan, and to modify it without any requirement that the modification shall have the required fairness, etc., necessary for the adoption of the plan.

To summarize, § 403(e) itself confines the court's power to amend to proposals made *"before* a plan is confirmed," and which have the fairness, equity and lack of discrimination required by the statute. The Act also limits all jurisdiction of the bankruptcy court to a period prior to June 30, 1946, 56 Stat. 377, 11 U.S.C.A. § 404. Here, in defiance of the statute, this and the district court (1) give to state political bodies bankruptcy powers to amend the plan (2) *after* confirmation (3) *without* the statutory requirement for fairness, etc., and (4) long after 1946, when no federal jurisdiction exists even to initiate such bankruptcy relief.

B. *The delegation of modifying power is discriminatory on its face and violates §403(c) of the Act.*[3] The bonds and war-

rants are of the same class of debts.[4] Nevertheless, the debtor may procure a further reduction of the plan's reduced debt of the 25 percent of the bondholders and leave the debt of the warrant holders at the amount fixed by the plan; and the reverse. It is expressly provided that in the subsequent modification "No consent of the holders of said bonds shall be required to any amendment which affects only the warrants subject to the Warrant Retirement Plan and no consent of the holders of said warrants shall be required to any amendment which affects only the bonds subject to the Plan of 1932."

Could it be imagined that the district court would be upheld if that court found as non-discriminatory a plan under which some of the debtors of the same class received a smaller percentage of its debt than others of that class? Yet, the majority hold that what the district court may not do, it may *expressly* authorize the debtor, 75 percent of the bondholders and two state political bodies to do to 25 percent of the bondholders.

---

[2] It is not necessary to discuss the question whether Congress has the power to delegate such bankruptcy powers to state tribunals. Congress has not done so, and it is beyond the jurisdiction of the courts so to create such power.

[3] "Confirmation of plan; modifications; appeal

"(e) At the conclusion of the hearing, the judge shall make written findings of fact and his conclusions of law thereon, and shall enter an interlocutory decree confirming the plan if satisfied that (1) it is fair, equitable, and for the best interests of the creditors and does not discriminate unfairly in favor of any creditor or class of creditors; (2) complies with the provisions of this chapter; (3) has been accepted and approved as required by the provisions of subdivision (d) of this section; (4) all amounts to be paid by the petitioner for services or expenses incident to the composition have been fully disclosed and are reasonable; (5) the offer of the plan and its acceptance are in good faith; and (6) the petitioner is authorized by law to take all action necessary to be taken by it to carry out the plan. If not so satisfied, the judge shall enter an order dismissing the proceeding.

"Before a plan is confirmed, changes and modifications may be made therein, with the approval of the judge after hearing upon such notice to creditors as the judge may direct, subject to the right of

any creditor who shall previously have accepted the plan to withdraw his acceptance, within a period to be fixed by the judge and after such notice as the judge may direct, if, in the opinion of the judge, the change or modification will be materially adverse to the interest of such creditor, and if any creditor having such right of withdrawal shall not withdraw within such period, he shall be deemed to have accepted the plan as changed or modified: **Provided,** 'however, That the plan as changed or modified shall comply with all the provisions of this chapter and shall have been accepted in writing by the petitioner. Either party may appeal from the interlocutory decree as in equity cases. In case said interlocutory decree shall prescribe a time within which any action is to be taken, the running of such time shall be suspended in case of an appeal until final determination thereof. In case said decree is affirmed, the judge may grant such time as he may deem proper for the taking of such action."

[4] Finding LXIX is "That all of the claims and securities affected by the Plan of Composition, including said bonds not heretofore deposited in accordance with the provisions of said Plan and Agreement of 1932, and including said refunding bonds and including the deposited and the non-deposited registered warrants, are payable from assessments levied against the lands within the Imperial Irrigation District, and that all of said claims are of a single class." (Emphasis supplied.)

C. *The delegation of power to the modifying group is unfair and inequitable on its face.* Since the modification is to be initiated by the debtor district, it is obvious that no modification will be sought which increases its indebtedness. Yet, though in the course of the 37 years of the expanding empire of California the district may become enormously prosperous and able to pay a much larger share of its indebtedness, no provision is made in favor of the creditors whereby they may initiate a proceeding for any increase in payment of their debt. I am unable to see anything more unfair and inequitable in the debtor-creditor relationship than to forecast their future relation only with reference to the benefit of the debtor.

Nor can I concur in the majority's apparent reliance on the statement that the plan would have lacked the consent of the bondholders if the 75 percent and the district had not been given this control of the 25 percent. The demand for such control of one group over another, without the intervention of a judicial tribunal, seems to suggest unfairness rather than the warrant for our approval of the plan.

I dissent from the holding of the majority opinion with respect to these fundamentals that "We see no occasion for frittering away that power by analyzing the details of a complicated plan and holding that some of the details are inconsistent with the statute because not expressly provided for therein."

Each so-called "detail" presented by appellants here should have received the judicial consideration of the court with reference to the specific provisions of the Act which appellants claim to have been violated.

The decree approving the plan should be reversed.